# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE:                  )    Chapter 11

CHAPCO CARTON COMPANY,      )    Case No. 04 B 26000
a Delaware corporation          )
FEIN 36-2057071              )

       Debtor.           )    Honorable Bruce W. Black

## NOTICE OF EMERGENCY MOTIONS

To:    See attached service list

**PLEASE TAKE NOTICE** that on Wednesday, the 14th day of July, 2004, at the hour of 9:30 a.m., we shall appear before the Honorable Bruce W. Black, United States Bankruptcy Judge for the Northern District of Illinois, or any Judge sitting in his place and stead, in courtroom 615 of the United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, and then and there present the following emergency motions:

1.    **EMERGENCY MOTION FOR ENTRY OF: STIPULATION AND INTERIM ORDER (I) AUTHORIZING SECURED POST-PETITION FINANCING ON A SUPERPRIORITY BASIS PURSUANT TO 11 U.S.C. §364, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. §§363 AND 364, (III) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §363 AND 364, AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(C);**

2.    **EMERGENCY MOTION OF DEBTOR FOR ENTRY OF AN ORDER: (I) AUTHORIZING: (A) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM; (B) MAINTENANCE OF EXISTING BANK ACCOUNTS; (C) CONTINUED USE OF EXISTING BUSINESS FORMS; AND (D) CONTINUED USE OF EXISTING BOOKS AND RECORDS; AND (II) WAIVING INVESTMENT AND DEPOSIT REQUIREMENTS OF 11 U.S.C. § 345(B)**

3.    **EMERGENCY MOTION OF THE DEBTOR TO EMPLOY COUNSEL; and**

4.    **EMERGENCY MOTION OF THE DEBTOR TO EMPLOY FINANCIAL ADVISORS.**

Copies of said motions are attached hereto and hereby served upon you.

> CHAD H. GETTLEMAN, ESQ. ARDC #944858
> BRAD A. BERISH, ESQ. ARDC #06200891
> ADAM P. SILVERMAN, ESQ.  ARDC #6256676
> ADELMAN & GETTLEMAN, LTD.
> 53 W. Jackson Blvd., Suite 1050
> Chicago, IL  60604
> 312/435-1050

## CERTIFICATE OF SERVICE

I hereby certify that a true copies of the foregoing **Notice of Emergency Motions** and the **Motions** referred to therein, were served upon the persons as listed on the attached service list as indicated this 13th day of July, 2004.



Chad H. Gettleman, Esq.

# CHAPCO CARTON COMPANY
## BANKRUPTCY CASE NO. 04 B 26000
### SERVICE LIST

## PARTIES IN INTEREST

Office of U.S. Trustee *
U.S. Department of Justice
227 W. Monroe Street, Suite 3350
Chicago, IL   60606
Fax: 312-886-5794

Kugman Associates, Inc *
c/o Michael J. Golde, Esq.
21 South Clark St., Suite 3300
Chicago, IL 60603
Fax: 312-251-5551

## SECURED CREDITORS

Befco
Bayerische Hypo-Und Verei
150 East 42Nd Street
New York, NY 10017-4679
Fax: 212-661-2093

Cole Taylor Bank *
c/o Douglas J. Lipke, Esq.
Eric S. Prezant, Esq.
Vedder, Price, Kaufman & Kammholz, P.C.
222 North La Salle Street
Chicago, Illinois 60601-1003
Fax: 312-609-5005

IFC Credit Corp.
8700 Waukegan Rd., Suite 100
Morton Grove, IL 60053-2104
Fax: 847-663-6701

Indiana Department of Revenue
Indiana Government Center North
100 N. Senate Avenue, Rm. N105
Indianapolis, IN 46204
Fax: 317-358-4559

MAC Funding Corporation **
1500 Michael Drive, Suite H
Wood Dale, IL 60191
Phone: 630-538-5600
Fax: n/a

MLP U.S.A., Inc.
600 Barclay Boulevard
Lincolnshire, IL 60069
Fax: 847-634-9109

People's Capital & Leasing Corp.
13920 Flint St.
Shawnee Mission, KS 66221
Attn: Frank Fonseca
Fax: 913-338-0017
Fax: 203-759-1840

## TAXING AUTHORITIES

Internal Revenue Service
Special Procedures Branch
230 South Dearborn
Chicago, Il 60604-0000
Fax:  312/566-2826

District Director
Internal Revenue Service
P.O. Box 745
Chicago, IL 60690-0745
Attn: C:SPB:SI Stop 5014-CHI
FAX: 312/566-2825(6)

Illinois Department of Revenue
Bankruptcy Section Level 7-425
100 W. Randolph
Chicago, IL 60606
FAX: 312/814-4344

62895.1  7/13/04

Illinois Department of Employment Security
401 S. State Street, 6th Fl.
Chicago, IL 60605
Fax : 312-793-9834

## 20 LARGEST UNSECURED CREDITOR

Alois Box Company, Inc.
2000 N. Mannheim Rd.
Melrose Park, IL 60160
Fax: 708-681-4389

Anderson & Vreeland Inc.
525 W. University Drive
Arlington Heights, IL 60004
Fax: 419-636-4334

Cargill Financial Service
6000 Clearwater Drive
Minnetonka. MN 55343-9497
Fax: 952-984-3932

Cascades Boxboard Group, Inc.
692 E. Thornwood Drive
South Elgin, IL 60177
Fax: 514-289-1773

Ekvall International, Ltd.
309 Vine Street, Suite 710
Cincinnati, OH 45202
Fax: 513-721-8149

Gibbon America II, Corp.
801A N. State Street
Elgin, IL 60573
Fax: 847-931-1289

Graphic Packaging International, Inc.
JD Edwards Lockbox
PO Box 404161
Atlanta, GA 30384-4161
Fax: 770-644-2969

Interfilm Holdings, Inc.
PO Box 414218
Boston, MA 02241-4218
Fax: 864-269-5048

Joe Piper, Inc.
PO Box 11407
Drawer 367
Birmingham, AL 35246-0367
Fax: 205-290-2222

Mardi Transportation, Inc.
2375 Pratt Blvd.
Elk Grove Village, IL 60007
Fax: 847-640-9840

Newark Group
20 Jackson Drive
Cranford, NJ 07079
Fax: 908-276-2888

Newark Pacific Paperboard
PO Box 31001-0929
Pasedena, CA 91110-0929
Fax: 323-724-7509

Printers Service
PO Box 5120
Ironbound Station
Newark, NJ 07105-5120
Fax: 630-543-0856

RiverCor, LLC
2850 Gilchrist Rd., Building #5
Akron, OH 44305
Fax: 330-784-1148

Rock Tenn - Battle Creek Mill
177 Angell Street
Battle Creek, MI 49015
Fax: 269-969-7191

Rockford Paperboard, Inc.
PO Box 560
Rockford, MI 49341
Fax: 800-651-7874

Simkins Industries, Inc.
Dept. 0271, PO Box #40000
Hartford, CT 06151
Fax: 203-787-7402

Smurfit-Stone - Wabash
455 W. Factory Street
Wabash, IN 46992
Fax: 260-569-3410

The Custom Companies
PO Box 94338
Chicago, IL 60678-4338
Fax: 708-338-9702

Wisconsin Paperboard Corp.
20 Jackson Drive
Cranford, NJ 07016
Fax: 414-271-1001

* Via Personal Delivery
** Via UPS Overnight Mail

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| CHAPCO CARTON COMPANY, | ) | Case No. 04 B 26000 |
| a Delaware corporation | ) | |
| FEIN 36-2057071 | ) | |
| | ) | Honorable Bruce W. Black |
| Debtor. | ) | |

## EMERGENCY MOTION FOR ENTRY OF: STIPULATION AND INTERIM ORDER (I) AUTHORIZING SECURED POST-PETITION FINANCING ON A SUPERPRIORITY BASIS PURSUANT TO 11 U.S.C. §364, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. §§363 AND 364, (III) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §363 AND 364, AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(C)

NOW COMES, CHAPCO CARTON COMPANY, debtor and debtor-in-possession

herein ("Movant" or the "Debtor"), upon its emergency motion (the "Motion") for the entry of

an interim financing order pursuant to Sections 363 and 364 of title 11 of the United States Code,

11 U.S.C. §§ 101, et seq. (the "Code") and Rules 2002, 4001, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), (I) Authorizing Secured Post-petition Financing

on a Superpriority Basis Pursuant to 11 U.S.C. §364, (II) Authorizing Use of Cash Collateral

Pursuant to 11 U.S.C. §§363 and 364, (III) Granting Adequate Protection Pursuant to 11 U.S.C.

§363 and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c). In

support of the Motion, the Debtor respectfully represents as follows:

## I.    INTRODUCTION[1]

---

[1] All capitalized terms used herein and not otherwise defined herein shall be ascribed their
meaning and definition as set forth in the proposed Interim Financing Order.

### A.    The Chapter 11 Case

1.      On July 13, 2004 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Code in this District and from and after said date has continued to manage its property and operate its business as debtor-in-possession under the jurisdiction of this Court (the "Chapter 11 Case").

2.      No trustee or creditors' committee has been appointed in the Chapter 11 Case.

3.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2).  The statutory predicate for the relief requested herein are Sections 363 and 364 of the Code, and Rule 4001 of the Bankruptcy Rules.

### B.    The Business of the Debtor

4.      For almost 70 years, Movant and its predecessor have been a family owned business. Movant's predecessor, Charles Paper Company, a wholesale paper distributor, was formed in 1936 by the father of Movant's current president. As the business grew through the years, it became involved in retail packaging. In 1977, Movant was incorporated under the laws of the state of Delaware, and took over the business of its predecessor. Since 1977, and continuing to date, Movant has been engaged in the business of manufacturing, selling and distributing folding cartons used for retail packaging in food, candy, office supplies and the automotive industries. Movant purchases paperboard product in large rolls and converts such raw material into finished goods through the processes of printing, cutting, folding and glueing. Movant's sales are conducted on a nationwide basis, with additional sales in Mexico. Substantially all of Movant's products are custom made bearing certain artwork specific to the

-2-

particular customer.

5.     Movant operates its business from leased facilities located at 515 Crossroads

Parkway, Bolingbrook, Illinois 60440.  Movant employs approximately 160 employees and had

approximately $28,000,000 in sales for its fiscal year ending June 30, 2004. Sales for the

previous year were in a similar range. Movant's operations are conducted on a 24 hour per day

basis utilizing three separate shifts, with certain departments operating on a 24/7 basis.

### C.     Events Leading to Chapter 11

6.     The Debtor initially encountered financial difficulties in September 2000 as a

result of over $1 million of extraordinary costs due to a major equipment failure and various

environmental clean up costs associated the relocation of its business to its current location.

Working capital problems arose and resulted in successful restructuring negotiations with

Movant's then secured lender, Bank One, NA. Thereafter, Movant began to enjoy a general

growth trend in sales throughout most of its fiscal year ending June 30, 2002. However,

beginning in Spring 2002, several of Movant's more significant customers filed bankruptcy

cases, thus rendering substantial accounts receivable uncollectible and exacerbating working

capital issues. In turn, this led Movant to undertake a further restructuring of its working capital

and equipment loans during 2003, which culminated on or about October 10, 2003. At that time,

Movant was successful in refinancing its working capital loans, consolidating numerous

equipment loans, and entering into repayment programs with several of Movant's larger

unsecured creditors. Despite this progress, Movant continued to incur increasing costs of

overhead, labor, raw materials, freight and insurance. Unfortunately, competitive pressures did

not allow Movant to match price increases on its products at the same rate as it was absorbing

operating cost increases. Profit margins deteriorated and created the working capital problems which led to the filing of this case.

### D.    Pre-Petition Indebtedness

7.    On October 10, 2003, the Debtor entered into a secured borrowing arrangement with Cole Taylor Bank (the "Bank") pursuant to, *inter alia*, that certain Loan and Security Agreement of even date therewith (the "Loan Agreement")(the Loan Agreement and all other documents executed and/or delivered by the Debtor in favor of the Bank shall be collectively referred to as the "Bank Loan Documents").  Under the Bank Loan Documents, the Debtor is liable to the Bank pursuant to a Revolving Note dated as of October 10, 2003, in the maximum amount of $4,500,000 (the "Revolving Note")(all indebtedness arising under the Revolving Note shall be collectively referred to as the "Pre-Petition Indebtedness").

8.    As of the Petition Date the Pre-Petition Indebtedness was approximately $3.64 million.

9.    The Debtor understands and believes that the Pre-Petition Indebtedness is secured by a lien and security interest in and to substantially all of its assets and all products and proceeds thereof pursuant to, *inter alia*, a UCC-1 financing statement filed with the Delaware Department of State, U.C.C. Filing Division, on October 3, 2003 as document number 32579806 (the "Prepetition Bank Lien").

10.    As part of the Bank Loan Documents, the Bank required many of the Debtor's then existing secured creditors to be paid in full and file UCC termination statements, essentially elevating the Bank to the first priority secured position.

11.    Notwithstanding the foregoing paragraph, the Bank permitted there to exist three

-4-

outstanding valid, prior liens incurred in connection with purchase money security interests in favor of: (a) MAC Funding Corporation (also referred to as MLP USA, Inc.); (b) People's Capital Leasing Corp; and (c) Bobst Equipment Finance Company, Inc. (assigned to Bayerische Hypo-Und Vereinsbank AG)(collectively, the "Permitted Liens"). The Permitted Liens are restricted to specifically listed equipment on the respective UCC financing statements filed by said lienors with the Delaware Secretary of State, UCC Filing Division.

12. Concurrent with the execution of the Bank Loan Documents, the Debtor made three unsecured promissory notes to three of its major vendors in the respective amounts of the Debtor's accounts payable to said vendors, each of which such notes were subordinated to the Bank (the "Subordinated Notes"), including: (a) $1,500,000 to The Newark Group, Inc; (b) $399,799.01 to Rockford Paperboard, Inc; and (c) $336,890 to Gibbon America II Corp.

13. Also concurrent with the execution of the Bank Loan Documents, the Debtor, the Bank and IFC Credit Corporation ("IFC") entered into an Intercreditor Agreement (the "Bank & IFC Intercreditor Agreement") under which IFC and the Bank agreed to the relative priority of their liens in various collateral. Immediately prior to the execution of the Bank Loan Documents, IFC and the Debtor were parties to a Master Loan Agreement (and schedules thereto) (the "IFC Master Loan Agreement") dated August 29, 2003 under which the Debtor granted IFC priority liens on specifically listed machinery and equipment in exchange for refinancing its then existing secured debt for such machinery and equipment in the approximate amount of $5,100,000. The Debtor understands and believes that the indebtedness incurred under the IFC Master Loan Agreement is secured by a lien and security interest in and to specified machinery and equipment pursuant to, *inter alia*, multiple UCC-1 financing statements filed or recorded by IFC with the

Delaware Department of State, U.C.C. Filing Division, on or about August 21 and 22, 2003, and December 16, 2003 (the "IFC Liens"). The relative priority of the Bank Lien and the IFC Liens are set forth and established by, the Bank & IFC Intercreditor Agreement, such that IFC has a first priority lien on its machinery and equipment, and the Bank has a first priority lien on the Debtor's remaining assets (other than that machinery and equipment subject to the prior Permitted Liens).

14.     In connection with the Bank & IFC Intercreditor Agreement (and the Bank Loan Documents), the Bank, IFC, and Cargill Financial Services Corporation ("Cargill") entered into a Subordination Agreement dated October 10, 2003, under which Cargill subordinated its debt to the Bank and IFC. Cargill is the holder of 748,314 shares of preferred stock of the Debtor and as of October 10, 2003, was owed $385,954 for accrued but unpaid dividends. Under an agreement between the Debtor and Cargill, the Debtor is obligated to redeem each of the shares of preferred stock issued to Cargill.

15.     In sum, the Debtor has five secured creditors, four of which encumber specific machinery and equipment, and each of which has a respective first priority interest in said specified machinery and equipment. In addition to the Debtor's general accounts payable, the Debtor is indebted to three of its trade creditors pursuant to unsecured promissory notes, each of which is subordinated to the Bank. Finally, the Debtor has issued preferred stock which it is obligated to redeem. As the Debtor has undertaken significant debt to a number of creditors under a variety of debt vehicles, the Debtor requires additional capital going forward in order to continue to operate and maintain its going concern value. Absent such cash infusion, the Debtor's current debt structure will likely consume the entirety of the Debtor's assets without any

distribution to its many trade creditors.

### C. Debtor's Present Financial Condition, Pre-Petition Defaults and Need for Funding

16.     As stated, the Debtor has suffered working capital shortfalls as a result of increased costs, highly competitive pricing, and decreased profit margins. As a result, the Debtor is out of formula under the Bank Loan Documents, and the Bank could potentially refuse any funding requests of the Debtor. Currently, the Debtor does not expect to generate sufficient cash collateral to operate its business, and does not believe that it has the ability to adequately protect the Bank's security interests in a manner that would enable the Debtor to obtain authority to use cash collateral over the Bank's objections, or to obtain alternative financing.

17.     Due to its financial condition, and as a result of its previous attempts to obtain financing from other sources, the Debtor does not believe it is capable of obtaining alternative sources of cash or credit in the form of unsecured credit allowable as an administrative expense under § 503(b)(1) of the Code, unsecured credit allowable under §§ 364(a) and (b) of the Code, or secured credit pursuant to § 364(c) of the Code on terms and conditions more favorable to the Debtor's estate than those under the DIP Financing (as hereinafter defined). If the Debtor's financing were to be abruptly discontinued, its operations would be severely disrupted, it would be unable to pay operating expenses and unable to operate its business in an orderly manner, thereby severely impairing the value of its assets and its ability to either reorganize or sell its businesses either as a going concern or in an orderly liquidation. Accordingly, the Debtor and its estate will suffer immediate and irreparable harm unless the Debtor is immediately authorized to obtain credit on terms and conditions set forth in the proposed DIP Financing (as hereafter

defined) on an interim basis.

## II.   RELIEF REQUESTED

### A.   Interim DIP Financing[2]

18.     By this Motion, the Debtor requests the entry of an interim order which has been

negotiated with and is acceptable to the Bank (the "Interim Financing Order"), approving the

Bank's agreement to advance post-petition funds in the form of revolving loans to the Debtor

(the "DIP Financing") pursuant to a budget approved by the Bank (the "Budget") and the related

Bank Loan Documents, from the date of the Interim Financing Order through the date of entry of

a final order (the "Interim Financing Period"), as more fully set forth in the Interim Financing

Order. A true and correct copy of the Budget is attached hereto as Exhibit A and incorporated

herein; a true and correct copy of the Revolving Note and the Loan Agreement is attached hereto

as Exhibit B and incorporated herein; a true and correct copy of the Interim Financing Order is

attached hereto as Exhibit C and incorporated herein.

### B.   DIP Financing Beyond the Interim Financing Period

19.     The Debtor further request the entry of a final order (the "Final Financing

Order") in form and substance acceptable to the Bank, authorizing continued borrowing by the

Debtor beyond the Interim Financing Period until the earlier of July 12, 2005, or an event giving

rise to the an earlier termination date, as set forth in the Dip Interim Financing Order.

### C.   Budget for DIP Financing

20.     The Budget sets forth all projected cash receipts, sales and cash disbursements (by

---

[2] In paragraph 24 of this Motion, the Debtor has highlighted the terms of the DIP
Financing which fall within the ambit of Sections 4001-2(a-i) and 4001-3 of the local rules of
bankruptcy procedure promulgated as of June 1, 2003.

line item) on a weekly basis for the time period from and including the weeks ending July 17, 2004 through August 21, 2004. The Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) to which the Bank and the Debtor agree in their respective discretion.

### D.   Negotiations in Good Faith

21.    The Bank and the Debtor conducted lengthy, good faith negotiations with respect to the terms and conditions of the DIP Financing, the Budget, the Interim Financing Order, and the Final Financing Order.

### E.   Consent to Partial Relief from Stay

22.    The Debtor consents to the Court's modification of the automatic stay pursuant to Section 362 of the Code, to the extent necessary to grant the relief requested herein and for the purposes set forth in the Interim Financing Order.

### F.   Final Hearing

23.    The Debtor further requests that the Court set a final hearing on the Motion pursuant to Rule 4001(c)(2) of the Bankruptcy Rules, to consider the entry of the Final Financing Order.

## III.   CERTAIN TERMS OF AND CONDITIONS TO THE DIP FINANCING

### A.   Identification of Key Provisions in the Interim Financing Order as Required Under Local Rule 4001-2

24.    The principal features of the DIP Financing can be described as follows:

a. Cross Collateralization Protection: Other than replacement liens and the granting of adequate protection, the Debtor is not directly seeking authority to grant cross-collateralization protection, but the Debtor hereby discloses that: (i) all Pre and Post-Petition Indebtedness due to the Bank shall be secured by a lien on avoidance actions

-9-

up to the Avoidance Action Lien Amount (*see* subparagraph d., below), provided, however, that said liens shall be subject and subordinate to the Budgeted/Incurred Claims, the Carve-out, and Prior Permitted Liens; and (ii) the Bank shall apply Collateral proceeds to the Pre-Petition Indebtedness prior to the Post-Petition Indebtedness as set forth subparagraph (e) below. **Interim Financing Order, ¶¶ 5, 6, 7, 9, 10, 23.**

b. Provisions Binding the Estate: Provisions and findings of fact that bind the estate with respect to the validity, perfection and amount of the Bank Lien and debt, and the waiver of claims against the Bank, are not final until 60 days after the formation of a creditors committee. Parties in interest shall also have 60 days after the formation of a creditors committee to contest said provisions and findings of fact. **Interim Financing Order, ¶25**

c. 506(c) Waiver: Other than the Carve Out and any unpaid Budgeted/Incurred Claims, the Debtor will not assert a claim under Section 506(c) of the Code for any costs and expenses incurred in connection with the preservation, protection, enhancement of, or realization by the Bank upon its collateral. **Interim Financing Order, ¶9**

d. Avoidance Actions The Bank shall receive a lien on avoidance actions proceeds only to the extent that (i) the Post-Petition Indebtedness plus the Pre-Petition Indebtedness, as of the earlier of the end of the Term or the Early Termination Date, exceeds the Pre-Petition Indebtedness as of the Petition Date, plus(ii) the diminution in value of the Bank's Collateral from the Petition Date to the earlier of the end of the Term or the Early Termination Date. **Interim Financing Order, ¶5.**

e. Use of Post-Petition Loans to Pay Pre-Petition Debt: Application of proceeds from the Collateral are to be applied as follows: First, to cover the expenses of the Bank; Second, Pre-Petition interest; Third, Pre-Petition principal; Fourth, Post-Petition Interest; and Fifth, Post-Petition principal. **Interim Financing Order, ¶10.**

f. Provisions Related to Use of Professional Fees: No loans, Collateral, Cash Collateral, or any portion of the Carve-Out may be used to object to or otherwise contest the Bank's Lien, in any respects, provided, however, that the Creditor's Committee may use its Carve Out to investigate claims against the Bank. **Interim Financing Order, ¶6.**

g. Priming Liens: There are no priming liens granted under the Interim Financing Order.

h. Lender Liability. The Debtor will release (without prejudice to the Committee's or other parties in interests' rights to timely assert a claim against the Bank as per

Interim Financing Order ¶ 25) the Bank from all claims it may have against the Bank, including claims for lender liability. **Interim Financing Order, ¶24.** Additionally, the Bank shall not be deemed to be acting as a "responsible person" or "owner or operator" with respect to operations of the Debtor. **Interim Financing Order, ¶21.**

i. Relief from Stay: Upon a Default or Event of Default, the automatic stay shall be deemed lifted upon three days notice by the Bank to the Debtor, its counsel, the United States Trustee, and the Creditors Committee, to allow the Bank to exercise any and all rights and remedies under the Bank Loan Documents and the Interim Financing Order, provided however, (a) upon occurrence of a Default or Event of Default, the Bank may without further action: (i) suspend all Post-Petition Financing and prohibit the Debtor's use of Cash Collateral; and (ii) setoff amounts in any Debtor accounts maintained with Bank, and (b) the Debtor, after notice and hearing, may seek to reinstate the automatic stay, use cash collateral, and contest the occurrence of a Default or Event of Default. **Interim Financing Order, ¶¶ 15, 17.**

25.     Additionally, under the DIP Financing, the maximum borrowing under the Revolving Note is $4.5 million, limited during the interim period for the purposes and expense amounts as set forth in the Budget, at the non-default rate of interest of prime plus 3% (default rate of prime plus 5%) , with a termination date of July 13, 2005 (or an earlier termination date as set forth in the Interim Financing Order), to be secured as set forth herein and in the DIP Financing Order.

B.     **APPLICABLE AUTHORITY FOR RELIEF REQUESTED**

26.     If a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Code, then the court, after notice and a hearing, may authorize the debtors to obtain credit or incur debt:

(a)  with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Code;

(b) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(c) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

27.     Rule 4001(c) of the Bankruptcy Rules governs the procedures for obtaining

authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain
> credit no earlier than 15 days after service of the motion. If the motion so
> requests, the court may conduct a hearing before such 15 day period expires,
> but the court may authorize the obtaining of credit only to the extent necessary
> to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed.R.Bankr.P. 4001(c). Accordingly, the Court is authorized to grant the relief requested

herein.

28.     The terms and provisions of the DIP Financing have been negotiated at arms'

length and in good faith. In addition, the terms and provisions of the DIP Financing are fair and

reasonable under the circumstances and reflect the most favorable terms upon which the Debtors

could obtain the needed post-petition financing.

29.     Having determined that financing was available only under Section 364(c) and (d)

of the Bankruptcy Code, the Debtor negotiated the DIP Financing pursuant to its business

judgment. Provided that this judgment does not run afoul of the provisions of and policies

underlying the Code, courts grant a debtor considerable defense in acting in accordance with its

business judgment. See Bray. v. Shenandoah Fed. Sav. & Loan Ass'n, 789 F.2d 1085, 1088 (4th

Cir. 1986)(approving debtors-in-possession financing necessary to sustain seasonal business); see

also In re Ames Department Stores, 115 B.R. 34, 40 (S.D.N.Y. 1990)("cases consistently reflect

that the court's discretion under Section 364 is to be utilized on grounds that permit reasonable

business judgment to be exercised so long as the financing agreement docs not contain terms that

leverage the bankruptcy process and powers or their purpose is not so much to benefit the estate as it is to benefit parties in interest").

30.     The DIP Financing provides significant additional liquidity to the Debtor and thus will enable the Debtors, among other things, to (a) maintain the continuity of its operations, and (b) maximize the value of its businesses and assets.  Such financing is the sole means of preserving and enhancing the Debtor's going concern value and retaining the possibility of reorganization or sale as a going concern.

31.     Accordingly, the Debtor believes that the approval of the DIP Financing is in the best interests of its estate, its creditors and all parties-in-interest, and that the Court should therefore grant the Motion, approve the Interim Financing Order and authorize the Debtor to enter into the DIP Financing arrangement.  Moreover, for the reasons hereinabove stated, the Bank should be accorded the benefits inuring under Section 364 of the Code.

### C.    NOTICE OF THE MOTION

32.     The Motion was filed on July 13, 2004.  The Debtor served by facsimile, hand delivery or overnight courier on the evening of July 13, 2004, the notice of the Motion and Preliminary Hearing, and a copy of the Motion and a proposed form of the Interim Financing Order on (i) the United States Trustee for the Northern District of Illinois, (ii) the District Counsel for the Internal Revenue Service, (iii) each of the Debtors' twenty (20) largest unsecured creditors, and (iv) the Debtors' secured creditors.  Such notice is appropriate and adequate under the circumstances.  Consequently, adequate notice and opportunity for a hearing has been given for the approval of the DIP Financing arrangement on an emergency and limited basis, pursuant with the provisions of Sections 363 and 364 of the Code, and Rules 2002, 4001 and 9014 of the

62811.1 7/13/04

-13-

Bankruptcy Rules, and any other applicable law, and no further notice relating to the entry of the Interim Financing Order is necessary or required.

**WHEREFORE**, the Debtor, CHAPCO CARTON COMPANY, respectfully request that the Court authorizing the DIP Financing on an interim basis, consistent with the expenses set forth in the Budget, which such expenses are necessary to avoid immediate and irreparable harm to the Debtor, and enter the Interim Financing Order substantially in the form of the order attached and incorporated hereto as <u>Exhibit C</u>, and set a further hearing to consider the final approval of the DIP Financing and the entry of a Final Financing Order, and grant such other and further relief as is just and proper, consistent with the terms hereof.

Dated: This 13th day of July, 2004

CHAPCO CARTON COMPANY,
a Delaware corporation, Debtor

By:_____
One of Its Attorneys

CHAD H. GETTLEMAN, ESQ. (ARDC #944858)
BRAD A. BERISH, ESQ (ARDC #06200891)
ADAM P. SILVERMAN, ESQ. (ARDC #6256676)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Boulevard Suite 1050
Chicago, Illinois 60604
312/435-1050
312/435-1059 fax
Counsel to Debtor

# EXHIBIT A

## Chapco Carton Company
### Cash Flow Forecast ($000)

| Description | Post-Petition Week Ending 07/17/04 | Post-Petition Week Ending 07/24/04 | Post-Petition Week Ending 07/31/04 | Post-Petition Week Ending 08/07/04 | Post-Petition Week Ending 08/14/04 | Post-Petition Week Ending 08/21/04 | Six Week Post-Petition Total |
|---|---|---|---|---|---|---|---|
| **BOOK BALANCE RECONCILIATION** | | | | | | | |
| Beginning Balance (book basis) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Cash Collections | $ 390.0 | $ 550.0 | $ 490.0 | $ 575.0 | $ 575.0 | $ 575.0 | $ 3,115.0 |
| Operating Disbursements | | | | | | | |
| Purchases/Disbursements | (236.0) | (230.0) | (230.0) | (230.0) | (242.0) | (243.8) | (1,411.8) |
| Manufacturing Overhead | (46.1) | (135.7) | (106.1) | (131.2) | (90.7) | (142.8) | (652.7) |
| Total Cost of Sales (Cash) | $ (282.1) | $ (365.7) | $ (336.1) | $ (361.2) | $ (332.7) | $ (386.3) | $ (2,064.2) |
| Selling & Admin. Expenses (Cash) | (48.9) | (175.9) | (49.1) | (178.7) | (51.8) | (172.9) | (676.2) |
| Total Operating Disbursements | (330.9) | (541.5) | (385.2) | (539.9) | (384.4) | (559.7) | (2,740.5) |
| Net Sales | 551.6 | 551.6 | 551.6 | 551.6 | 578.9 | 578.9 | |
| Non-Operating Disbursements | | | | | | | |
| Deposits | | | | | | | |
| Bank DIP Finance Agreement Fees/Interest | (87.5) | (40.0) | (40.0) | (32.9) | (4.0) | - | (80.0) |
| Bank legal counsel professional fees | (15.0) | (10.0) | (5.0) | (5.0) | (5.0) | (5.0) | (204.4) |
| Professional fees - equipment appraisal | - | (20.0) | - | - | - | (7.5) | (45.0) |
| Unsecured Creditor Committee fees/retainers | - | (30.0) | (5.0) | (5.0) | (5.0) | (5.0) | (27.5) |
| Legal and Restructuring fees | (70.0) | (70.0) | (70.0) | (65.0) | (65.0) | (60.0) | (40.0) |
| Total Non-Operating Disbursements | (152.5) | (160.0) | (120.0) | (107.9) | (79.0) | (77.5) | (400.0) |
| | | | | | | | (696.8) |
| Total Disbursements | $ (483.3) | $ (701.5) | $ (505.2) | $ (547.8) | $ (463.4) | $ (656.2) | $ (3,437.3) |
| Ending Balance (book basis) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

Chapco DIP Operating Budget.xls
7/13/2004 12:15 PM

## Chapco Carton Company
### Cash Flow Forecast ($000)

| Description | Post-Petition Week Ending 07/17/04 | Post-Petition Week Ending 07/24/04 | Post-Petition Week Ending 07/31/04 | Post-Petition Week Ending 08/07/04 | Post-Petition Week Ending 08/14/04 | Post-Petition Week Ending 08/21/04 | Six Week Post-Petition Total |
|---|---|---|---|---|---|---|---|
| **COST OF SALES (Cash Only)** | | | | | | | |
| Purchasing Disbursements | | | | | | | |
| Board | 210.0 | 200.0 | 200.0 | 200.0 | 206.0 | 211.8 | 1,227.8 |
| Ink | 13.0 | 15.0 | 15.0 | 15.0 | 18.0 | 15.0 | 91.9 |
| Corrugated | 13.0 | 15.0 | 15.0 | 15.0 | 18.0 | 15.9 | 91.9 |
| Total Purchasing Disbursements | 236.0 | 230.0 | 230.0 | 230.0 | 242.0 | 242.6 | 1,411.6 |
| | | | | | | | |
| Manufacturing Overhead | | | | | | | |
| Salaries / Payroll Taxes(WRBF) | | 88.7 | | 84.3 | | 84.3 | 257.3 |
| Pension Contribution | | 0.8 | | 0.8 | | 0.8 | 2.4 |
| Industrial Relations | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 7.8 |
| Plate Expense - Materials & Supplies | 8.5 | 6.5 | 8.5 | 8.5 | 8.9 | 8.9 | 51.8 |
| Insurance (General, WC, Group) | | | 60.0 | | | | 60.0 |
| Rent | | | | | | | - |
| Real Estate Taxes | | | | | | 10.0 | 34.0 |
| Equipment Rental | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 90.0 |
| Repair & Maint (Bldg, Equip, Salaries) | 21.3 | 21.3 | 21.3 | 21.3 | 22.4 | 22.4 | 130.0 |
| Shop Supplies | | | | | 19.0 | | 19.0 |
| Utilities | | | | | | | - |
| Total Manufacturing Overhead | 292.1 | 355.7 | 106.1 | 131.2 | 90.7 | 142.8 | 850.7 |
| | | | | | | | |
| Total Cost of Sales (Cash Only) | 292.1 | 355.7 | 336.1 | 361.2 | 332.7 | 386.3 | 2,054.2 |
| | | | | | | | |
| **SELLING & ADMINISTRATIVE (Cash Only)** | | | | | | | |
| Salaries / Payroll Taxes(WRBF) | | 126.7 | | 120.4 | | 120.4 | 367.5 |
| Pension Contribution | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 1.8 |
| Insurance (see above) | | | | | | | - |
| Auto, Truck, & Delivery | 20.7 | 20.7 | 20.7 | 20.7 | 21.8 | 21.8 | 126.6 |
| Shipping | 5.6 | 5.6 | 5.6 | 5.6 | 5.9 | 5.9 | 34.6 |
| Commissions | 5.5 | 6.0 | 6.0 | 6.0 | 8.1 | 8.3 | 35.8 |
| Data Processing | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 6.0 |
| License & Taxes | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 9.0 |
| Rent | | | | | | | - |
| Real Estate Taxes | | | | 8.0 | | | 8.0 |
| Utilities | | | | | | | 7.2 |
| Office Expense & Postage | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 7.2 |
| Officers' Life Insurance | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 10.2 |
| Sales Expense | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 6.6 |
| Telephone | | | | 1.2 | | 1.2 | 3.6 |
| Miscellaneous | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 60.0 |
| | | | | | | | |
| Total Selling & Administrative | 48.6 | 175.8 | 49.1 | 178.7 | 51.8 | 172.3 | 678.2 |

Chapco DIP Operating Budget.xls   7/13/2004, 12:16 PM

# Exhibit B

**LOAN AND SECURITY AGREEMENT**

**DATED AS OF OCTOBER 10, 2003**

**BETWEEN**

**COLE TAYLOR BANK,**

**AS LENDER,**

**AND**

**CHAPCO CARTON COMPANY,**

**AS BORROWER**

**Table of Contents**

**Page**

1.  DEFINITIONS ................................................................. 1

2.  LOANS ......................................................................... 2
    (a)   Revolving Loans ..................................................... 2
    (b)   Repayments ............................................................ 4
    (c)   Notes .................................................................... 4

3.  LETTERS OF CREDIT ................................................. 4
    (a)   General Terms ........................................................ 4
    (b)   Requests for Letters of Credit ................................. 5
    (c)   Obligations Absolute .............................................. 5
    (d)   Expiration Dates of Letters of Credit ...................... 5

4.  INTEREST, FEES AND CHARGES ............................... 6
    (a)   Interest Rate ........................................................... 6
    (b)   [Intentionally Deleted] ........................................... 6
    (c)   Fees and Charges ................................................... 6
    (d)   Maximum Interest .................................................. 7

5.  COLLATERAL ............................................................. 7
    (a)   Grant of Security Interest to Lender ....................... 7
    (b)   Other Security ....................................................... 8
    (c)   Possessory Collateral ............................................ 8
    (d)   Electronic Chattel Paper ........................................ 8
    (e)   Letter-of-Credit Rights ........................................... 8
    (f)   Third-Party Collateral ............................................ 9
    (g)   Deposit Account ..................................................... 9

6.  PRESERVATION OF COLLATERAL AND PERFECTION OF SECURITY
    INTERESTS THEREIN ................................................. 9

7.  POSSESSION OF COLLATERAL AND RELATED MATTERS ................... 9

8.  COLLECTIONS ........................................................... 10

9.  COLLATERAL, AVAILABILITY AND FINANCIAL REPORTS AND
    SCHEDULES ............................................................... 11
    (a)   Daily Reports ........................................................ 11
    (b)   Monthly Reports .................................................... 11
    (c)   Financial Statements ............................................. 12
    (d)   Annual Projections ................................................ 12
    (e)   Explanation of Budgets and Projections .................. 12
    (f)   Other Information .................................................. 12

10. TERMINATION; AUTOMATIC RENEWAL ................... 13

CHICAGO/#1090985.6

**Table of Contents**
**(cont'd)**

**Page**

11.  REPRESENTATIONS AND WARRANTIES................................................................ 13
    (a)  Financial Statements and Other Information ....................................... 13
    (b)  Locations; Certain Collateral ............................................................... 14
    (c)  Loans by Borrower .............................................................................. 14
    (d)  Accounts and Inventory ....................................................................... 14
    (e)  Liens..................................................................................................... 14
    (f)  Organization, Authority and No Conflict ............................................ 14
    (g)  Litigation.............................................................................................. 15
    (h)  Compliance with Laws and Maintenance of Permits .......................... 15
    (i)  Affiliate Transactions.......................................................................... 15
    (j)  Names and Trade Names ...................................................................... 15
    (k)  Equipment ............................................................................................ 16
    (l)  Enforceability....................................................................................... 16
    (m)  Solvency............................................................................................... 16
    (n)  Indebtedness......................................................................................... 16
    (o)  Margin Security and Use of Proceeds ................................................. 16
    (p)  Parent, Subsidiaries and Affiliates...................................................... 16
    (q)  No Defaults .......................................................................................... 16
    (r)  Employee Matters ................................................................................ 17
    (s)  Intellectual Property............................................................................. 17
    (t)  Environmental Matters......................................................................... 17
    (u)  ERISA Matters..................................................................................... 17

12.  AFFIRMATIVE COVENANTS ............................................................................. 17
    (a)  Maintenance of Records ...................................................................... 17
    (b)  Notices ................................................................................................. 18
    (c)  Compliance with Laws and Maintenance of Permits .......................... 19
    (d)  Inspection and Audits .......................................................................... 19
    (e)  Insurance .............................................................................................. 20
    (f)  Collateral.............................................................................................. 21
    (g)  Use of Proceeds.................................................................................... 21
    (h)  Taxes.................................................................................................... 21
    (i)  Intellectual Property............................................................................. 22
    (j)  Checking Accounts .............................................................................. 22
    (k)  Key Man Insurance .............................................................................. 22

13.  NEGATIVE COVENANTS .................................................................................... 22
    (a)  Indebtedness......................................................................................... 22
    (b)  Liens..................................................................................................... 23
    (c)  Mergers, Sales, Acquisitions, Subsidiaries and Other Transactions Outside
       the Ordinary Course of Business ........................................................ 23
    (d)  Dividends and Distributions ................................................................ 23
    (e)  Investments; Loans .............................................................................. 23
    (f)  Fundamental Changes, Line of Business............................................. 24
    (g)  Equipment............................................................................................ 24

CHICAGO/#1090985.6

**Table of Contents**
**(cont'd)**

**Page**

| | | |
|---|---|---|
| (h) | Affiliate Transactions | 24 |
| (i) | Settling of Accounts | 24 |
| (j) | Management Fees; Compensation | 24 |

**14.** FINANCIAL COVENANTS ... 24
    (a) Tangible Net Worth ... 25
    (b) Fixed Charge Coverage ... 25
    (c) Capital Expenditure Limitations ... 25
    (d) Operating Lease Obligations ... 25

**15.** DEFAULT ... 26
    (a) Payment ... 26
    (b) Breach of This Agreement and the Other Agreements ... 26
    (c) Breaches of Other Obligations ... 26
    (d) Breach of Representations and Warranties ... 26
    (e) Loss of Collateral ... 26
    (f) Levy, Seizure or Attachment ... 26
    (g) Bankruptcy or Similar Proceedings ... 26
    (h) Appointment of Receiver ... 27
    (i) Judgment ... 27
    (j) Death or Dissolution of Obligor ... 27
    (k) Default or Revocation of Guaranty; Subordination Agreement ... 27
    (l) Criminal Proceedings ... 27
    (m) Change of Control ... 28
    (n) Change of Management ... 28
    (o) Material Adverse Change ... 28
    (p) Key Man Insurance ... 28
    (q) Default Under Term Loan Documents or Investor Documents ... 28
    (r) Fiscal Year 2003 Financial Statements ... 28
    (s) Cash Infusion ... 28

**16.** REMEDIES UPON AN EVENT OF DEFAULT ... 28

**17.** CONDITIONS PRECEDENT ... 29

**18.** INDEMNIFICATION ... 30

**19.** NOTICE ... 31

**20.** CHOICE OF GOVERNING LAW; CONSTRUCTION; FORUM SELECTION ... 31

**21.** MODIFICATION AND BENEFIT OF AGREEMENT ... 32

**22.** HEADINGS OF SUBDIVISIONS ... 32

**23.** POWER OF ATTORNEY ... 32

CHICAGO/#1090985.6

## Table of Contents
### (cont'd)

|   |   | **Page** |
|---|---|---|
| 24. | CONFIDENTIALITY | 32 |
| 25. | COUNTERPARTS | 33 |
| 26. | ELECTRONIC SUBMISSIONS | 33 |
| 27. | WAIVER OF JURY TRIAL; OTHER WAIVERS | 33 |

CHICAGO/#1090985.6

ANNEX 1 – DEFINED TERMS

EXHIBIT A – BORROWING BASE CERTIFICATE

EXHIBIT B – COMPLIANCE CERTIFICATE

EXHIBIT C – DOCUMENT CHECKLIST

SCHEDULE 1 – PERMITTED LIENS

SCHEDULE 11(b) – BUSINESS AND COLLATERAL LOCATIONS

SCHEDULE 11(b) – CERTAIN COLLATERAL

SCHEDULE 11(c) – LOANS BY BORROWER

SCHEDULE 11(f) - CAPITALIZATION

SCHEDULE 11(g) – LITIGATION

SCHEDULE 11(i) – AFFILIATE TRANSACTIONS

SCHEDULE 11(j) – NAMES & TRADE NAMES

SCHEDULE 11(n) – INDEBTEDNESS

SCHEDULE 11(p) – PARENT, SUBSIDIARIES AND AFFILIATES

SCHEDULE 11(q) – CERTAIN DEFAULTS

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (as amended, modified or supplemented from time to time, this "**Agreement**") made this 10th day of October, 2003 by and between COLE TAYLOR BANK ("**Lender**"), 111 West Washington Street, Suite 400, Chicago, Illinois 60602, and CHAPCO CARTON COMPANY, a Delaware corporation, having its principal place of business at 515 West Crossroads Parkway, Bolingbrook, Illinois 60440 ("**Borrower**").

### W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

WHEREAS, Borrower may, from time to time, request Loans from Lender, and the parties wish to provide for the terms and conditions upon which such Loans or other financial accommodations, if made by Lender, shall be made;

NOW, THEREFORE, in consideration of any Loan (including any Loan by renewal or extension) hereafter made to Borrower by Lender, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Borrower, the parties agree as follows:

1.  **DEFINITIONS**.

    (a)   **Defined Terms**.   For the purposes of this Agreement, the following capitalized words and phrases shall have the meanings set forth in Annex I attached hereto and made a part hereof.

    (b)   **Accounting Terms**.  Any accounting terms used in this Agreement which are not specifically defined herein shall have the meanings customarily given them in accordance with GAAP.  Calculations and determinations of financial and accounting terms used and not otherwise specifically defined hereunder and the preparation of financial statements to be furnished to the Lender pursuant hereto shall be made and prepared, both as to classification of items and as to amount, in accordance with GAAP as used in the preparation of the financial statements of the Borrower on the date of this Agreement.  If any changes in accounting principles or practices from those used in the preparation of the financial statements are hereafter occasioned by the promulgation of rules, regulations, pronouncements and opinions by or required by the Financial Accounting Standards Board or the American Institute of Certified Public Accountants (or any successor thereto or agencies with similar functions), which results in a material change in the method of accounting in the financial statements required to be furnished to the Lender hereunder or in the calculation of financial covenants, standards or terms contained in this Agreement, the parties hereto agree to enter into good faith negotiations to amend such provisions so as equitably to reflect such changes to the end that the criteria for evaluating the financial condition and performance of the Borrower will be the same after such changes as they were before such changes; and, if the parties fail to agree on the amendment of such provisions, the Borrower will furnish financial statements in accordance with such changes but shall provide calculations for all financial covenants, perform all financial covenants and otherwise observe all financial standards and terms in accordance with applicable accounting principles and practices in effect immediately prior to such changes.

(c)   **Terms Defined in UCC**.  The terms "Account", "Account Debtor", "Certificated Security", "Chattel Paper", "Commercial Tort Claim", "Deposit Account", "Document", "Electronic Chattel Paper", "Equipment", "Financial Asset", "Fixture", "General Intangible", "Goods", "Health-Care-Insurance Receivables", "Instrument", "Inventory", "Investment Property", "Letter-of-Credit Right", "Payment Intangible", "Proceeds", "Security", "Securities Account", "Security Entitlement", "Software", "Supporting Obligation", "Tangible Chattel Paper" and "Uncertificated Security" shall have the respective meanings assigned to such terms in the UCC.  All other capitalized words and phrases used herein and not otherwise specifically defined shall have the respective meanings assigned to such terms in the UCC, to the extent the same are used or defined therein.

(d)   **Other Definitional Provisions; Construction**.  Whenever the context so requires, the neuter gender includes the masculine and feminine, the single number includes the plural, and vice versa, and in particular the word "Borrower" shall be so construed.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and references to Article, Section, Subsection, Annex, Schedule, Exhibit and like references are references to this Agreement unless otherwise specified.  The word "including" shall mean "including, without limitation".  An Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in accordance with Section 27(e) hereof.  References in this Agreement to any party shall include such party's successors and permitted assigns.  References to any "Section" shall be a reference to such Section of this Agreement unless otherwise stated.  To the extent any of the provisions of the Other Agreements are inconsistent with the terms of this Loan Agreement, the provisions of this Loan Agreement shall govern.  This Agreement and the Other Agreements are the result of negotiations among and have been reviewed by counsel to the Lender, Borrower and any other parties thereto, are product of all parties and, accordingly, they shall not be construed against the Lender.

(e)   **References to Agreements, Enactments, Etc**.  Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement) and other contractual instruments shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent such amendments, restatements, supplements and other modifications are not prohibited by the terms of this Agreement or any Other Agreement, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation.

2.   **LOANS.**

(a)   **Revolving Loans**.  Subject to the terms and conditions of this Agreement and the Other Agreements, during the Original Term and any Renewal Term, Lender shall, absent an Event of Default, make revolving loans and advances (the "**Revolving Loans**") in an amount up to the sum of the following sublimits (the "**Revolving Borrowing Base Amount**"):

(i)   Up to eighty-five percent (85%), or such lesser percentage as determined by Lender in its sole discretion exercised in good faith (and Lender shall use commercially reasonable efforts to provide Borrower with prior notice of any such

decrease, but any failure to do so will not in any way affect Lender's rights hereunder), of the face amount (less maximum discounts, credits and allowances which may be taken by or granted to Account Debtors in connection therewith in the ordinary course of Borrower's business) of Borrower's Eligible Accounts or Four Million Five Hundred Thousand and No/100 Dollars ($4,500,000), whichever is less; provided that such advance rate shall be reduced by one (1) percentage point for each whole or partial percentage point by which Dilution (as determined by Lender in good faith based on the results of the most recent twelve (12) month period for which Lender has conducted a field audit of Borrower) exceeds five percent (5%) (the "**Maximum AR Amount**"); plus

(ii)   Up to fifty-five percent (55%), or such lesser percentage as determined by Lender in its sole discretion exercised in good faith (and Lender shall use commercially reasonable efforts to provide Borrower with prior notice of any such decrease, but any failure to do so will not in any way affect Lender's rights hereunder), of the lower of cost or market value of Borrower's Eligible Inventory or Two Million and No/100 Dollars ($2,000,000), whichever is less; minus

(iii)   such reserves as Lender elects, in its discretion, determined in good faith, to establish from time to time;

provided, that (x) the sum of the advances to Borrower with respect to clause (ii) above shall at no time exceed an amount equal to one hundred twenty-five percent (125%) of the Maximum AR Amount and (y) the Revolving Borrowing Base Amount shall in no event exceed Four Million Five Hundred Thousand and No/100 Dollars ($4,500,000) (the "Maximum Revolving Loan Limit"), except as such amount may be increased or decreased by Lender, in its sole discretion.

The aggregate unpaid principal balance of the Revolving Loans shall not at any time exceed the lesser of the (i) Revolving Borrowing Base Amount minus the Letter of Credit Obligations and (ii) the Maximum Revolving Loan Limit minus the Letter of Credit Obligations. If at any time the outstanding Revolving Loans exceeds either the Revolving Borrowing Base Amount or the Maximum Revolving Loan Limit, in each case minus the Letter of Credit Obligations, or any portion of the Revolving Loans and Letter of Credit Obligations exceeds any applicable sublimit within the Revolving Borrowing Base Amount, Borrower shall immediately, and without the necessity of demand by Lender, pay to Lender such amount as may be necessary to eliminate such excess and Lender shall apply such payment to the Revolving Loans to eliminate such excess.

Borrower hereby authorizes Lender, in its sole discretion to charge any of Borrower's accounts or advance Revolving Loans to make any payments of principal, interest, fees, costs or expenses due under this Agreement or the Other Agreements. Lender shall use commercially reasonable efforts to provide Borrower written notice one (1) Business Day prior to charging Borrower's accounts or advancing Revolving Loans in respect of costs or expenses required to be paid by Borrower under this Agreement or the Other Agreements, except during the existence of an Event of Default; provided that the failure of Bank to provide such notice shall not adversely affect Borrower's obligations or Lender's rights under the Loan Documents. With respect to any scheduled payment of principal, interest or fees due under the Loan

3

Documents, it is Lender's practice to charge Borrower's accounts or advance Revolving Loans, as applicable, on the scheduled due date for such payment absent the existence of an Event of Default; provided that the failure of Bank to charge Borrower's accounts or advance Revolving Loans in respect of such payment on the scheduled due date shall not adversely affect Borrower's obligations or Lender's rights under the Loan Documents.

A request for a Revolving Loan shall be made or shall be deemed to be made, each in the following manner: Borrower shall give Lender same-day notice, no later than 1:00 p.m. (determined based on the local time of Borrower at its principal place of business) on such day, of its request for a Revolving Loan. In the event that Borrower maintains a controlled disbursement account with Lender, each check presented for payment against such controlled disbursement account and any other charge or request for payment against such controlled disbursement account shall constitute a request for a Revolving Loan. As an accommodation to Borrower, Lender may permit telephone requests for Revolving Loans and electronic transmittal of instructions, authorizations, agreements or reports to Lender by Borrower. Unless Borrower specifically directs Lender in writing not to accept or act upon telephonic or electronic communications from Borrower, Lender shall have no liability to Borrower for any loss or damage suffered by Borrower as a result of Lender's honoring of any requests, execution of any instructions, authorizations or agreements or reliance on any reports communicated to it telephonically or electronically and purporting to have been sent to Lender by Borrower, and Lender shall have no duty to verify the origin of any such communication or the authority of the Person sending it.

Borrower hereby irrevocably authorizes Lender to disburse the proceeds of each Revolving Loan requested by Borrower, or deemed to be requested by Borrower, as follows: the proceeds of each Revolving Loan requested under Section 2(a) shall be disbursed by Lender in lawful money of the United States of America in immediately available funds, in the case of the initial borrowing, in accordance with the terms of the written disbursement letter from Borrower, and in the case of each subsequent borrowing, by wire transfer or Automated Clearing House (ACH) transfer to such bank account as may be agreed upon by Borrower and Lender from time to time, or elsewhere if pursuant to a written direction from Borrower.

(b)    **Repayments**. The Revolving Loans and all other Obligations shall be repaid on the last day of the Original Term or any Renewal Term if this Agreement is renewed pursuant to Section 10 hereof.

(c)    **Notes**. The Loans shall, in Lender's sole discretion, be evidenced by one or more promissory notes in form and substance satisfactory to Lender. However, if such Loans are not so evidenced, such Loans may be evidenced solely by entries upon the books and records maintained by Lender.

3.    **LETTERS OF CREDIT**.

(a)    **General Terms**. Subject to the terms and conditions of the Agreement and the Other Agreements, during the Original Term or any Renewal Term, Lender may, in its sole discretion, absent an Event of Default, from time to time cause to be issued and co-sign for or otherwise guarantee, upon Borrower's request, commercial and/or standby Letters of Credit;

4

provided, that the aggregate undrawn face amount of all such Letters of Credit shall at no time exceed an amount to be determined by Lender from time to time in its sole discretion. Payments made by Lender to any Person on account of any Letter of Credit shall constitute Revolving Loans hereunder, and Borrower agrees that each payment made by the issuer of a Letter of Credit in respect of a Letter of Credit shall constitute a request by Borrower for a Revolving Loan to reimburse such issuer. Borrower shall remit to Lender a Letter of Credit fee based upon a percentage, to be agreed upon in writing between Lender and Borrower at the time of issuance of any Letter of Credit hereunder, of the aggregate undrawn face amount of all Letters of Credit outstanding, which fee shall be payable monthly in arrears on the last Business Day of each month. Borrower shall also pay on demand the normal and customary administrative charges of the issuer of the Letter of Credit for issuance, amendment, negotiation, renewal or extension of any Letter of Credit. Lender has no commitment to issue Letters of Credit pursuant to this Agreement, and, as of the date of this Agreement, there are no Letters of Credit outstanding.

(b)    **Requests for Letters of Credit**. Borrower shall make requests for Letters of Credit in writing at least two (2) Business Days prior to the date such Letter of Credit is to be issued. Each such request shall specify the date such Letter of Credit is to be issued, the amount thereof, the name and address of the beneficiary thereof, and a description of the transaction to be supported thereby. Any such notice shall be accompanied by the form of Letter of Credit requested and any application or reimbursement agreement required by the issuer of such Letter of Credit. If any term of such application or reimbursement agreement is inconsistent with this Agreement, then the provisions of this Agreement shall control to the extent of such inconsistency.

(c)    **Obligations Absolute**. Borrower shall be obligated to reimburse the issuer of any Letter of Credit, or Lender, if Lender has reimbursed such issuer on Borrower's behalf, for any payments made in respect of any Letter of Credit, which obligation shall be unconditional and irrevocable and shall be paid regardless of: (i) any lack of validity or enforceability of any Letter of Credit, (ii) any amendment or waiver of or consent or departure from all or any provisions of any Letter of Credit, this Agreement or any Other Agreement, (iii) the existence of any claim, set off, defense or other right which Borrower or any other Person may have against any beneficiary of any Letter of Credit, Lender or the issuer of the Letter of Credit, (iv) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid, or insufficient in any respect or any statement therein being untrue or inaccurate in any respect, (v) any payment under any Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, and (vi) any other act or omission to act or delay of any kind of the issuer of such Letter of Credit, the Lender or any other Person or any other event or circumstance that might otherwise constitute a legal or equitable discharge of Borrower's obligations hereunder. It is understood and agreed by Borrower that the issuer of any Letter of Credit may accept documents that appear on their face to be in order without further investigation or inquiry, regardless of any notice or information to the contrary.

(d)    **Expiration Dates of Letters of Credit**. The expiration date of each Letter of Credit shall be no later than the earlier of (i) one (1) year from the date of issuance and (ii) the thirtieth (30th) day prior to the end of the Original Term or any Renewal Term. Notwithstanding the foregoing, a Letter of Credit may provide for automatic extensions of its

5

expiration date for one or more one (1) year period, so long as the issuer thereof has the right to terminate the Letter of Credit at the end of each one (1) year period and no extension period extends past the thirtieth (30th) day prior to the end of the Original Term or any Renewal Term.

4.    **INTEREST, FEES AND CHARGES**.

(a)    **Interest Rate**.

Each Revolving Loan shall bear interest at the rate of one and one-half percent (1.5%) per annum in excess of the Prime Rate in effect from time to time, payable on the last Business Day of each month in arrears. Said rate of interest shall increase or decrease by an amount equal to each increase or decrease in the Prime Rate effective on the effective date of each such change in the Prime Rate. Upon the occurrence of an Event of Default and during the continuance thereof, each Loan shall bear interest at the rate of two percent (2%) per annum in excess of the interest rate otherwise payable thereon, which interest shall be payable on demand. All interest shall be calculated on the basis of a 360-day year.

(b)    **[Intentionally Deleted]**

(c)    **Fees and Charges**.

(i)    Facilities Fee:  Borrower shall pay to Lender an annual facilities fee equal to one-half percent (0.5%) of the Maximum Loan Limit, which fee shall be fully earned by Lender and payable on each anniversary of the date of this Agreement during the Original Term and any Renewal Term.

(ii)    Closing Fee:  Borrower shall pay to Lender a closing fee of Twenty-Two Thousand Five Hundred Dollars ($22,500), which fee shall be fully earned and payable on the date of disbursement of the initial Loans hereunder.

(iii)    Costs and Expenses:  Borrower shall reimburse Lender for all costs and expenses, including, without limitation, legal expenses and reasonable attorneys' fees (whether for internal or outside counsel), incurred by Lender in connection with the (i) documentation and consummation of this transaction and any other transactions between Borrower and Lender, including, without limitation, Uniform Commercial Code and other public record searches and filings, overnight courier or other express or messenger delivery, appraisal costs, surveys, title insurance and environmental audit or review costs; (ii) collection, protection or enforcement of any rights in or to the Collateral; (iii) collection of any Obligations; and (iv) administration and enforcement of any of Lender's rights under this Agreement or any Other Agreement. Borrower shall also pay all normal service charges with respect to all accounts maintained by Borrower with Lender and any additional services requested by Borrower from Lender. All such costs, expenses and charges shall, if owed to Lender, be reimbursed by Lender and, in such event or in the event such costs and expenses are owed to Lender, shall constitute Obligations hereunder, shall be payable by Borrower to Lender on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

6

(iv)   <u>Capital Adequacy Charge</u>.  If Lender shall have determined that the adoption of any law, rule or regulation regarding capital adequacy, or any change therein or in the interpretation or application thereof, or compliance by Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any central bank or governmental authority enacted after the date hereof, does or shall have the effect of reducing the rate of return on such party's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by a material amount, then, from time to time after submission by Lender to Borrower of a written demand therefor ("**Capital Adequacy Demand**") together with the certificate described below, Borrower shall pay to Lender such additional amount or amounts ("**Capital Adequacy Charge**") as will compensate Lender for such reduction, such Capital Adequacy Demand to be made with reasonable promptness following such determination.  A certificate of Lender claiming entitlement to payment as set forth above shall be conclusive in the absence of manifest error.  Such certificate shall set forth the nature of the occurrence giving rise to such reduction, the amount of the Capital Adequacy Charge to be paid to Lender, and the method by which such amount was determined.  In determining such amount, Lender may use any reasonable averaging and attribution method, applied on a non-discriminatory basis.

(d)   **Maximum Interest**.  It is the intent of the parties that the rate of interest and other charges to Borrower under this Agreement and the Other Agreements shall be lawful; therefore, if for any reason the interest or other charges payable under this Agreement are found by a court of competent jurisdiction, in a final determination, to exceed the limit which Lender may lawfully charge Borrower, then the obligation to pay interest and other charges shall automatically be reduced to such limit and, if any amount in excess of such limit shall have been paid, then such amount shall be refunded to Borrower.

5.   **COLLATERAL**.

(a)   **Grant of Security Interest to Lender**.  As security for the payment of all Loans now or in the future made by Lender to Borrower hereunder and for the payment or other satisfaction of all other Obligations, Borrower hereby assigns to Lender and grants to Lender a continuing security interest in the following property of Borrower, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located:  (a) all Accounts (whether or not Eligible Accounts) and all Goods whose sale, lease or other disposition by Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, Borrower; (b) all Chattel Paper, Instruments, Documents and General Intangibles (including, without limitation, all Intellectual Property, licenses, software, franchises, tax refund claims, claims against carriers and shippers, guarantee claims, contract rights, Payment Intangibles, security interests, security deposits and rights to indemnification); (c) all Inventory (whether or not Eligible Inventory); (d) all Goods (other than Inventory), including, without limitation, Equipment, vehicles and Fixtures; (e) all Investment Property; (f) all Deposit Accounts, bank accounts, deposits and cash; (g) all Letter-of-Credit Rights; (h) Commercial Tort Claims listed on <u>Schedule 11(b)</u> hereto from time to time; (i) any other property of Borrower now or hereafter in the possession, custody or control of Lender or any agent or any parent,

7

affiliate or subsidiary of Lender or any participant with Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise); and (j) all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property, and all of Borrower's books and records relating to any of the foregoing and to Borrower's business; provided that, the Collateral shall not include the Term Lender Collateral while the Term Lender Intercreditor Agreement is in effect.

(b)    **Other Security**.  Lender, in its sole discretion, without waiving or releasing any obligation, liability or duty of Borrower under this Agreement or the Other Agreements or any Event of Default, may at any time or times hereafter, but shall not be obligated to, pay, acquire or accept an assignment of any Lien asserted by any Person in, upon or against any of the Lenders' Collateral, provided, that Lender may take such actions with respect to Permitted Liens only after the occurrence and during the continuance of an Event of Default. All sums paid by Lender in respect thereof and all costs, fees and expenses including, without limitation, reasonable attorney fees, all court costs and all other charges relating thereto incurred by Lender shall constitute Obligations payable by Borrower to Lender on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

(c)    **Possessory Collateral**.  Immediately upon Borrower's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including, without limitation, any Tangible Chattel Paper and any Investment Property consisting of Certificated Securities, Borrower shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance reasonably acceptable to Lender). If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as Borrower's attorney and agent-in-fact, to endorse or assign the same on Borrower's behalf.

(d)    **Electronic Chattel Paper**.  To the extent that Borrower obtains or maintains any Electronic Chattel Paper, Borrower shall create, store and assign the record or records comprising the Electronic Chattel Paper in such a manner that (i) a single authoritative copy of the record or records exists which is unique, identifiable and, except as otherwise provided in clauses (iv), (v) and (vi) below, unalterable, (ii) the authoritative copy identifies Lender as the assignee of the record or records, (iii) the authoritative copy is communicated to and maintained by the Lender or its designated custodian, (iv) copies or revisions that add or change an identified assignee of the authoritative copy can only be made with the participation of Lender, (v) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy and (vi) any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

(e)    **Letter-of-Credit Rights**.  If Borrower at any time is a beneficiary under a letter of credit now or hereafter issued in favor of Borrower, at the request and option of Lender, Borrower shall, pursuant to an agreement in form and substance reasonably satisfactory to Lender, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Lender of the proceeds of any drawing under the letter of credit, or (ii) arrange for Lender to become the transferee beneficiary of the letter of credit, with Lender agreeing, in each

8

case, that the proceeds of any drawing under the letter to credit are to be applied as provided in this Agreement.

(f) **Third-Party Collateral**. If Borrower shall at any time hold or acquire an interest in Collateral in the possession of a third party (other than Certificated Securities and Goods covered by a Document), Borrower shall promptly obtain an acknowledgment from the third party that it is holding such Collateral for the benefit of the Lender.

(g) **Deposit Account**. Borrower shall deliver to Lender, with respect to each Deposit Account maintained by Borrower now or hereafter (other than with Lender) and that is permitted hereby, upon obtaining an interest in such Deposit Account, a deposit account control agreement in form and substance reasonably satisfactory to Lender, executed by the financial institution at which such account is maintained, and shall take such other actions as Lender may reasonably request to ensure that Lender's security interest in such account is perfected by control as such term is used in UCC Section 9-104.

## 6. PRESERVATION OF COLLATERAL AND PERFECTION OF SECURITY INTERESTS THEREIN.

Borrower shall, at Lender's request, at any time and from time to time, authenticate, execute and deliver to Lender such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed necessary or desirable by Lender) and do such other acts and things or cause third parties to do such other acts and things as Lender may deem necessary or desirable in its sole discretion, exercised in a commercially reasonable manner, in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Lender (free and clear of all other Liens, except Permitted Liens) to secure payment of the Obligations, and in order to facilitate the collection of the Collateral. Borrower irrevocably hereby makes, constitutes and appoints Lender (and all Persons designated by Lender for that purpose) as Borrower's true and lawful attorney and agent-in-fact to execute and file such financing statements, documents and other agreements and instruments and do such other acts and things as may be necessary to preserve and perfect Lender's security interest in the Collateral. Borrower further agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement shall be sufficient as a financing statement. Borrower further ratifies and confirms the prior filing by Lender of any and all financing statements which identify the Borrower as debtor, Lender as secured party and any or all Collateral as collateral.

## 7. POSSESSION OF COLLATERAL AND RELATED MATTERS.

Until otherwise notified by Lender following the occurrence of an Event of Default, Borrower shall have the right, except as otherwise provided in this Agreement, in the ordinary course of Borrower's business, to (a) sell, lease or furnish under contracts of service any of Borrower's Inventory normally held by Borrower for any such purpose; (b) use and consume any raw materials, work in process or other materials normally held by Borrower for such purpose; and (c) dispose of obsolete or unuseful Equipment so long as all of the proceeds thereof are paid to Lender for application to the Obligations (except for such proceeds which are required to be delivered to the holder of a Permitted Lien which is prior in right of payment, including, without

9

limitation, Term Lender with respect to the Term Lender Collateral); provided, however, that a sale in the ordinary course of business shall not include any transfer or sale in satisfaction, partial or complete, of a debt owed by Borrower.

8. **COLLECTIONS**.

(a)    Borrower shall direct all of its Account Debtors to make all payments on the Accounts directly to a post office box (the "Lock Box") designated by, and under the exclusive control of, Lender. Borrower shall establish an account (the **"Lock Box Account"**) in Lender's name with Lender, into which all payments received in the Lock Box shall be deposited, and into which Borrower will immediately deposit all payments received by Borrower on Accounts in the identical form in which such payments were received, whether by cash or check. If Borrower, any Affiliate or Subsidiary, any shareholder, officer, director, employee or agent of Borrower or any Affiliate or Subsidiary, or any other Person acting for or in concert with Borrower shall receive any monies, checks, notes, drafts or other payments relating to or as Proceeds of Accounts or other Collateral, Borrower and each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Lender and, immediately upon receipt thereof, shall remit the same (or cause the same to be remitted) in kind to the Lock Box Account. Borrower agrees that all payments made to such Lock Box Account or otherwise received by Lender, whether in respect of the Accounts or as Proceeds of other Collateral or otherwise (except for proceeds of Collateral which are required to be delivered to the holder of a Permitted Lien which is prior in right of payment), will be applied on account of the Obligations in accordance with the terms of this Agreement. Borrower agrees to pay all customary fees, costs and expenses in connection with opening and maintaining the Lock Box and Lock Box Account. All of such fees, costs and expenses shall constitute Obligations hereunder, shall be payable to Lender by Borrower upon demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder. All checks, drafts, instruments and other items of payment or Proceeds of Collateral shall be endorsed by Borrower to Lender, and, if that endorsement of any such item shall not be made for any reason, Lender is hereby irrevocably authorized to endorse the same on Borrower's behalf. For the purpose of this section, Borrower irrevocably hereby makes, constitutes and appoints Lender (and all Persons designated by Lender for that purpose) as Borrower's true and lawful attorney and agent-in-fact (i) to endorse Borrower's name upon said items of payment and/or Proceeds of Collateral and upon any Chattel Paper, Document, Instrument, invoice or similar document or agreement relating to any Account of Borrower or Goods pertaining thereto; (ii) to take control in any manner of any item of payment or Proceeds thereof; and (iii) to have access to any lock box or postal box into which any of Borrower's mail is deposited, and open and process all mail addressed to Borrower and deposited therein.

(b)    Lender may, from time to time after the occurrence and during the continuance of an Event of Default, whether before or after notification to any Account Debtor and whether before or after the maturity of any of the Obligations, (i) enforce collection of any of Borrower's Accounts or other amounts owed to Borrower by suit or otherwise; (ii) exercise all of Borrower's rights and remedies with respect to proceedings brought to collect any Accounts or other amounts owed to Borrower; (iii) surrender, release or exchange all or any part of any Accounts or other amounts owed to Borrower, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder; (iv) sell or assign

any Account of Borrower or other amount owed to Borrower upon such terms, for such amount and at such time or times as Lender deems advisable; (v) prepare, file and sign Borrower's name on any proof of claim in bankruptcy or other similar document against any Account Debtor or other Person obligated to Borrower; and (vi) do all other acts and things which are necessary in Lender's sole discretion, exercised in a commercially reasonable manner, to fulfill Borrower's obligations under this Agreement and the Other Agreements and to allow Lender to collect the Accounts or other amounts owed to Borrower. In addition to any other provision hereof, Lender may at any time after the occurrence and during the continuance of an Event of Default, at Borrower's expense, notify any parties obligated on any of the Accounts to make payment directly to Lender of any amounts due or to become due thereunder.

(c)     For purposes of calculating interest and fees, Lender shall, within two (2) Business Days after receipt by Lender at its office in Chicago, Illinois of (i) checks and (ii) cash or other immediately available funds from collections of items of payment and Proceeds of any Collateral, apply the whole or any part of such collections or Proceeds against the Obligations in such order as Lender shall determine in its sole discretion. For purposes of determining the amount of Loans available for borrowing purposes, checks and cash or other immediately available funds from collections of items of payment and Proceeds of any Collateral shall be applied in whole or in part against the Obligations, in such order as Lender shall determine in its sole discretion, on the day of receipt, subject to actual collection.

(d)     On a monthly basis, Lender shall deliver to Borrower an account statement showing all Loans, charges and payments which shall be deemed final, binding and conclusive upon Borrower unless Borrower notifies Lender in writing, specifying any error therein, within thirty (30) days of the date such account statement is sent to Borrower, and any such notice shall only constitute an objection to the items specifically identified.

## 9.  COLLATERAL, AVAILABILITY AND FINANCIAL REPORTS AND SCHEDULES.

(a)     **Daily Reports**. Borrower shall deliver to Lender an executed borrowing base certificate in the form of Exhibit B hereto on each day on which Borrower requests a Revolving Loan, and in any event at least once each week, which shall be accompanied by copies of Borrower's sales journal, cash receipts journal and credit memo journal for the relevant period. Such borrowing base certificate shall reflect the activity of Borrower with respect to Accounts for the immediately preceding week, and shall be in a form and with such specificity as is satisfactory to Lender in its sole discretion, exercised in a commercially reasonable manner, and shall contain such additional information concerning Accounts and Inventory as may be requested by Lender in its sole discretion, exercised in a commercially reasonable manner, including, without limitation, but only if specifically requested by Lender, copies of all invoices prepared in connection with such Accounts.

(b)     **Monthly Reports**. Borrower shall deliver to Lender, in addition to any other reports, as soon as practicable and in any event: (i) within twenty (20) days after the end of each month, (A) a detailed trial balance of Borrower's Accounts aged per invoice date, in form and substance reasonably satisfactory to Lender, including, without limitation, the names and addresses of all Account Debtors of Borrower, and (B) a summary and detail of accounts payable

11

(such Accounts and accounts payable divided into such time intervals as Lender may require in its sole discretion, exercised in a commercially reasonable manner), including a listing of any held checks; and (ii) within twenty (20) days after the end of each month, the general ledger inventory account balance, a perpetual inventory report and Lender's standard form of Inventory report then in effect or the form most recently requested from Borrower by Lender, for Borrower by each category of Inventory, together with a description of the monthly change in each category of Inventory.

(c)    **Financial Statements**.  Borrower shall deliver to Lender the following financial information, all of which shall be prepared in accordance with GAAP consistently applied, and shall be accompanied by a    certificate in the form of Exhibit B hereto, which compliance certificate shall include a calculation of all financial covenants contained in this Agreement:  (i) no later than thirty (30) days after each calendar month, copies of internally prepared financial statements, including, without limitation, balance sheets and statements of income, retained earnings and cash flow of Borrower, certified by the Chief Financial Officer of Borrower and (ii) no later than one hundred twenty (120) days after the end of each of Borrower's Fiscal Years (or, with respect to the Fiscal Year ending June 30, 2003, within sixty (60) days after the date hereof), reviewed annual financial statements with an unqualified opinion (or, with respect to the Fiscal Year ending June 30, 2003, a review statement satisfactory to Lender in its discretion, exercised in good faith) by independent certified public accountants selected by Borrower and reasonably satisfactory to Lender (it being understood that Miller Cooper & Co., Ltd. is acceptable to the Lender), which financial statements shall be accompanied by (A) a letter from such accountants acknowledging that they are aware that a primary intent of Borrower in obtaining such financial statements is to influence Lender and that Lender is relying upon such financial statements in connection with the exercise of its rights hereunder, provided, that Borrower shall only be required to use its reasonable efforts exercised in good faith to obtain such letter; and (B) copies of any management letters sent to the Borrower by such accountants.

(d)    **Annual Projections**.  As soon as practicable and in any event no later than thirty (30) days prior to the beginning of each Fiscal Year, Borrower shall deliver to Lender projected balance sheets, statements of income and cash flow for Borrower, for each of the twelve (12) months during such Fiscal Year, which shall include the assumptions used therein, together with appropriate supporting details as reasonably requested by Lender.

(e)    **Explanation of Budgets and Projections**.  In conjunction with the delivery of the annual presentation of projections or budgets referred to in Subsection 9(d) above, Borrower shall deliver a letter signed by the President or a Vice President of Borrower and by the Treasurer or Chief Financial Officer of Borrower, describing, comparing and analyzing, in detail, all changes and developments between the anticipated financial results included in such projections or budgets and the historical financial statements of Borrower.

(f)    **Other Information**.  Promptly following request therefor by Lender, such other business or financial data, reports, appraisals and projections as Lender may reasonably request.

12

10.    **TERMINATION; AUTOMATIC RENEWAL**.

THIS AGREEMENT SHALL BE IN EFFECT FROM THE DATE HEREOF UNTIL OCTOBER 10, 2005 (THE "ORIGINAL TERM") AND SHALL AUTOMATICALLY RENEW ITSELF FROM YEAR TO YEAR THEREAFTER (EACH SUCH ONE-YEAR RENEWAL BEING REFERRED TO HEREIN AS A "RENEWAL TERM") UNLESS (A) THE DUE DATE OF THE OBLIGATIONS IS ACCELERATED PURSUANT TO SECTION 16 HEREOF; OR (B) BORROWER OR LENDER ELECTS TO TERMINATE THIS AGREEMENT AT THE END OF THE ORIGINAL TERM OR AT THE END OF ANY RENEWAL TERM BY GIVING THE OTHER PARTY WRITTEN NOTICE OF SUCH ELECTION AT LEAST NINETY (90) DAYS PRIOR TO THE END OF THE ORIGINAL TERM OR THE THEN-CURRENT RENEWAL TERM AND IN WHICH CASE BORROWER SHALL PAY ALL OF THE OBLIGATIONS IN FULL ON THE LAST DAY OF SUCH TERM.  If one or more of the events specified in clauses (A) or (B) occurs or this Agreement otherwise expires, then (i) Lender shall not make any additional Loans on or after the date identified as the date on which the Obligations are to be repaid; and (ii) this Agreement shall terminate on the date thereafter that the Obligations are paid in full.  At such time as Borrower has repaid all of the Obligations and this Agreement has terminated, Borrower shall deliver to Lender a release, in form and substance reasonably satisfactory to Lender, of all obligations and liabilities of Lender and its officers, directors, employees, agents, parents, subsidiaries and affiliates to Borrower, and, if Borrower is obtaining new financing from another lender, Borrower shall deliver such lender's indemnification of Lender, in form and substance reasonably satisfactory to Lender, for checks which Lender has credited to Borrower's account, but which subsequently are dishonored for any reason or for automatic clearinghouse or wire transfers not yet posted to Borrower's account.  If, during the term of this Agreement, Borrower prepays all of the Obligations from any source other than income from the ordinary course operations of Borrower's business and this Agreement is terminated, Borrower agrees to pay to Lender as a prepayment fee, in addition to the payment of all other Obligations, an amount equal to (i) three percent (3%) of the Maximum Loan Limit if such prepayment occurs one (1) year or more prior to the end of the Original Term, or (ii) two percent (2%) of the Maximum Loan Limit if such prepayment occurs less than one (1) year prior to the end of the Original Term.

11.    **REPRESENTATIONS AND WARRANTIES**.

Borrower hereby represents and warrants to Lender, which representations and warranties (whether appearing in this Section 11 or elsewhere) shall be true at the time of Borrower's execution hereof and the closing of the transactions described herein or related hereto, shall remain true until the repayment in full and satisfaction of all the Obligations and termination of this Agreement, and shall be remade by Borrower at the time each Loan is made pursuant to this Agreement, provided, that representations and warranties made as of a particular date shall be true and correct as of such date.

(a)    **Financial Statements and Other Information**.  The financial statements and other information delivered or to be delivered by Borrower to Lender at or prior to the date of this Agreement fairly present in all material respects the financial condition of Borrower, and there has been no material adverse change in the financial condition, the operations or any other status of Borrower since the date of the financial statements delivered to Lender most recently

13

prior to the date of this Agreement. All written information now or heretofore furnished by Borrower to Lender is true and correct in all material respects as of the date with respect to which such information was furnished. Borrower's Tangible Net Worth (as defined in Section 14) was no less than ($4,599,000) as of August 31, 2003.

(b)   **Locations; Certain Collateral**. The office where Borrower keeps its books, records and accounts (or copies thereof) concerning the Lenders' Collateral, Borrower's principal place of business and all of Borrower's other places of business, locations of Lenders' Collateral and post office boxes and locations of bank accounts are as set forth in Schedule 11(b) and at other locations within the continental United States of which Lender has been advised by Borrower in accordance with Subsection 12(b)(i). The tangible portion of Lenders' Collateral (except any part thereof which Borrower shall have advised Lender in writing consists of Lenders' Collateral normally used in more than one state) is kept, or, in the case of vehicles, based, only at the addresses set forth on Schedule 11(b), and at other locations within the continental United States of which Lender has been advised by Borrower in writing in accordance with Subsection 12(b)(i) hereof. Schedule 11(b) hereto contains a complete listing of all of Borrower's (a) Intellectual Property which is subject to registration statutes and licenses of Intellectual Property to which Borrower is a party (whether as licensor or licensee), (b) Instruments (other than Instruments deposited for collection in the ordinary course of business), (c) Deposit Accounts, (d) Investment Property, (e) Letter-of-Credit Rights, (f) Chattel Paper, (g) Documents, (h) Commercial Tort Claims, (i) Lenders' Collateral which is subject to certificate of title statutes, and (j) tangible Lenders' Collateral located with any bailee, warehousemen or other third parties.

(c)   **Loans by Borrower**. Except as set forth on Schedule 11(c), Borrower has not made any loans or advances to any Affiliate or other Person except for advances authorized hereunder to employees, officers and directors of Borrower for travel and other expenses arising in the ordinary course of Borrower's business.

(d)   **Accounts and Inventory**. Each Account or item of Inventory which Borrower shall, expressly or by implication, request Lender to classify as an Eligible Account or as Eligible Inventory, respectively, shall, as of the time such request is made, conform in all respects to the requirements of such classification as set forth in the respective definitions of "Eligible Account" and "Eligible Inventory" as set forth herein and as otherwise established by Lender from time to time.

(e)   **Liens**. Borrower is the lawful owner of all Lenders' Collateral now purportedly owned or hereafter purportedly acquired by Borrower, free from all Liens, other than the Permitted Liens.

(f)   **Organization, Authority and No Conflict**. Borrower is a corporation, duly organized, validly existing and in good standing in the State of Delaware, its state organizational identification number is 0833909 and Borrower is duly qualified and in good standing in all states where the nature and extent of the business transacted by it or the ownership of its assets makes such qualification necessary or, if Borrower is not so qualified, Borrower may cure any such failure without losing any of its rights, incurring any Liens or material penalties, or otherwise affecting Lender's rights. Borrower has the right and power and is duly authorized

14

and empowered to enter into, execute and deliver this Agreement and the Other Agreements and perform its obligations hereunder and thereunder. Borrower's execution, delivery and performance of this Agreement and the Other Agreements do not conflict with the provisions of the organizational documents of Borrower, any statute, regulation, ordinance or rule of law, or any agreement, contract or other document which may now or hereafter be binding on Borrower, except for conflicts with agreements, contracts or other documents which would not have a Material Adverse Effect on Borrower, and Borrower's execution, delivery and performance of this Agreement and the Other Agreements shall not result in the imposition of any Lien upon any of Borrower's property (other than Permitted Liens) under any existing indenture, mortgage, deed of trust, loan or credit agreement or other agreement or instrument by which Borrower or any of its property may be bound or affected. Schedule 11(f) sets forth, as of the date hereof, the number, class and holder of all outstanding capital stock of Borrower, and the number of authorized and treasury shares of capital stock of Borrower. Except as described on Schedule 11(f), there are no outstanding options to purchase, or any rights or warrants to subscribe for, or any commitments or agreements to issue or sell any capital stock or obligations convertible into, or any powers of attorney relating to any capital stock of Borrower. Except as set forth on Schedule 11(f), as of the date hereof, there are no outstanding agreements or instruments binding upon Borrower or any shareholder, as the case may be, relating to the ownership or voting of Borrower's capital stock. No class of capital stock of Borrower has voting rights other than Borrower's common stock.

(g) **Litigation**. Except as disclosed to Lender on Schedule 11(g) hereto, there are no actions or proceedings which are pending or, to the best of Borrower's knowledge, threatened against Borrower which are reasonably likely to have a Material Adverse Effect on Borrower.

(h) **Compliance with Laws and Maintenance of Permits**. Borrower has obtained all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a Material Adverse Effect on Borrower. Borrower is in compliance in all material respects with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety) the failure to comply with which would have a Material Adverse Effect on Borrower.

(i) **Affiliate Transactions**. Except as set forth on Schedule 11(i) hereto or as permitted pursuant to Subsection 11(c) hereof, Borrower is not conducting, permitting or suffering to be conducted, transactions with any Affiliate other than transactions with Affiliates for the purchase or sale of Inventory or services in the ordinary course of business pursuant to terms that are no less favorable to Borrower than the terms upon which such transactions would have been made had they been made to or with a Person that is not an Affiliate.

(j) **Names and Trade Names**. Borrower's name has been as set forth on the first page of this Agreement for the last five years and Borrower uses no trade names, assumed names, fictitious names or division names in the operation of its business, except as set forth on Schedule 11(j) hereto.

15

(k)  **Equipment**.  Except for Permitted Liens, Borrower has good and indefeasible and merchantable title to and ownership of all Equipment.  No Equipment is a Fixture to real estate unless such real estate is owned by Borrower and is subject to a mortgage in favor of Lender or, if such real estate is leased, is subject to a landlord's agreement in favor of Lender on terms acceptable to Lender, or an accession to other personal property, unless such personal property is subject to a Lien in favor of Lender and no other Liens other than Permitted Liens.

(l)  **Enforceability**.  This Agreement and the Other Agreements to which Borrower is a party are the legal, valid and binding obligations of Borrower and are enforceable against Borrower in accordance with their respective terms subject, as to enforceability, to general principles of equity and bankruptcy, insolvency and similar laws affecting creditors' rights generally.

(m)  **Solvency**.  Borrower is, after giving effect to the transactions contemplated hereby, solvent, able to pay its debts as they become due, has capital sufficient to carry on its business, now owns property having a value both at fair valuation and at present fair saleable value greater than the amount required to pay its debts, and will not be rendered insolvent by the execution and delivery of this Agreement or any of the Other Agreements or by completion of the transactions contemplated hereunder or thereunder.

(n)  **Indebtedness**.  Borrower is not obligated (directly or indirectly) for any Indebtedness other than (i) the Loans and (ii) as set forth on Schedule 11(n) hereto.  Borrower has provided to Lender complete copies of the agreements, instruments and other documents evidencing the Indebtedness disclosed on Schedule 11(n), including all schedules, exhibits and disclosure letters referred to therein or delivered pursuant thereto, if any, and all amendments thereto, waivers relating thereto and other side letters or agreements affecting the term thereof.  None of such agreements and documents has been amended or supplemented, nor have any of the provisions thereof been waived, except pursuant to a written agreement or agreement which has heretofore been delivered to the Lender.

(o)  **Margin Security and Use of Proceeds**.  Borrower does not own any margin securities, and none of the proceeds of the Loans hereunder shall be used for the purpose of purchasing or carrying any margin securities or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase any margin securities or for any other purpose not permitted by Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

(p)  **Parent, Subsidiaries and Affiliates**.  Except as set forth on Schedule 11(p) hereto, Borrower has no Parents, Subsidiaries or other Affiliates or divisions, nor is Borrower engaged in any joint venture or partnership with any other Person.

(q)  **No Defaults**.  Except as set forth on Schedule 11(q), Borrower is not in default under any material contract, lease or commitment to which it is a party or by which it is bound, nor does Borrower know of any dispute regarding any contract, lease or commitment which would have a Material Adverse Effect on Borrower.

16

(r)    **Employee Matters**. There are no controversies pending or, to Borrower's knowledge, threatened between Borrower and any of its employees, agents or independent contractors, other than employee grievances arising in the ordinary course of business which would not, in the aggregate, have a Material Adverse Effect on Borrower, and Borrower is in compliance with all federal and state laws respecting employment and employment terms, conditions and practices except for such noncompliance which would not have a Material Adverse Effect on Borrower.

(s)    **Intellectual Property**. Borrower possesses adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, tradestyles and trade names to continue to conduct its business as heretofore conducted by it except to the extent that the failure to possess such items would not have a Material Adverse Effect on Borrower.

(t)    **Environmental Matters**.    Except as set forth on <u>Schedule 11(g)</u>, Borrower has not generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Materials, on or off its premises (whether or not owned by it) in any manner which at any time violates in any material respect any Environmental Law, or any license, permit, certificate, approval or similar authorization thereunder, and the operations of the Borrower comply in all material respects with all Environmental Laws and all licenses, permits, certificates, approvals and similar authorizations thereunder.    Except as set forth on <u>Schedule 11(g)</u>, there has been no investigation, proceeding, complaint, order, directive, claim, citation or notice by any governmental authority or any other Person, nor is any pending or, to the best of the Borrower's knowledge, threatened with respect to any non-compliance with or violation of the requirements of any Environmental Law by the Borrower or the release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter which affects the Borrower or its business, operations or assets or any properties at which the Borrower has transported, stored or disposed of any Hazardous Materials.    Borrower has no material liability (contingent or otherwise) in connection with a release, spill or discharge of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials.

(u)    **ERISA Matters**. Borrower has paid and discharged all obligations and liabilities arising under ERISA of a character which, if unpaid or unperformed, might result in the imposition of a Lien against any of its properties or assets.

12.    **AFFIRMATIVE COVENANTS**.

Until payment and satisfaction in full of all Obligations and termination of this Agreement, unless Borrower obtains Lender's prior written consent waiving or modifying any of Borrower's covenants hereunder in any specific instance, Borrower covenants and agrees as follows:

(a)    **Maintenance of Records**. Borrower shall at all times keep accurate and complete books, records and accounts with respect to all of Borrower's business activities, in

17

accordance with sound accounting practices and GAAP consistently applied, and shall keep such books, records and accounts, and any copies thereof, only at the addresses indicated for such purpose on Schedule 11(b).

    **(b)**    **Notices.** Borrower shall:

    **(i)**    Locations. Promptly (but in no event less than twenty (20) days prior to the occurrence thereof) notify Lender of the proposed opening of any new place of business or new location of any of Lenders' Collateral, the closing of any existing place of business or location of any of Lenders' Collateral, any change of in the location of Borrower's books, records and accounts (or copies thereof), the opening or closing of any post office box, the opening or closing of any bank account or, if any of the Lenders' Collateral consists of Goods of a type normally used in more than one state, the use of any such Goods in any state other than a state in which Borrower has previously advised Lender that such Goods will be used.

    **(ii)**    Eligible Accounts and Inventory. Promptly upon becoming aware thereof, notify Lender if any Account or Inventory identified by Borrower to Lender as an Eligible Account or Eligible Inventory becomes ineligible for any reason.

    **(iii)**    Litigation and Proceedings. Promptly, but not less than five (5) days after, upon becoming aware thereof, notify Lender of any actions or proceedings which are pending or threatened against Borrower which might have a Material Adverse Effect on Borrower and of any Commercial Tort Claims of Borrower which may arise, which notice shall constitute Borrower's authorization to amend Schedule 11(b) to add such Commercial Tort Claim.

    **(iv)**    Names and Trade Names. Notify Lender not less than twenty (20) days prior to the change of its legal name or the use of any trade name, assumed name, fictitious name or division name not previously disclosed to Lender in writing.

    **(v)**    ERISA Matters. Promptly notify Lender of (x) the occurrence of any "reportable event" (as defined in ERISA) which might result in the termination by the Pension Benefit Guaranty Corporation (the "PBGC") of any employee benefit plan ("Plan") covering any officers or employees of the Borrower, any benefits of which are, or are required to be, guaranteed by the PBGC, (y) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor or (z) its intention to terminate or withdraw from any Plan.

    **(vi)**    Environmental Matters. Immediately notify Lender upon becoming aware of any investigation, proceeding, complaint, order, directive, claim, citation or notice with respect to any noncompliance with or violation of the requirements of any Environmental Law by Borrower or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter which affects Borrower or its business operations or assets or any properties at which Borrower has transported, stored or

18

disposed of any Hazardous Materials unless the foregoing could not reasonably be expected to have a Material Adverse Effect on Borrower.

(vii)   <u>Default; Material Adverse Change</u>.  Promptly advise Lender of any material adverse change in the business, property, assets, operations or condition, financial or otherwise, of Borrower, the occurrence of any Event of Default hereunder or the occurrence of any event which, if uncured, will become an Event of Default after notice or lapse of time (or both).

(viii)   <u>Indebtedness; Preferred Stock</u>.  Promptly (and, in any event, not more than five (5) days after the occurrence thereof) advise Lender of any default or any event which, with the giving of notice or lapse of time, or both, would constitute a default, under any agreement, instrument or document evidencing or relating to (a) any Indebtedness other than to Lender (including, any Subordinated Debt or the Term Debt), or (b) Borrower's preferred stock, and, in each case, a certificate of an authorized officer of Borrower specifying the nature thereof and Borrower's proposed response thereto, in reasonable detail.

All of the foregoing notices shall be provided by Borrower to Lender in writing.

(c)   **Compliance with Laws and Maintenance of Permits**.  Borrower shall maintain all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a Material Adverse Effect on Borrower, and Borrower shall remain in compliance with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety) the failure with which to comply would have a Material Adverse Effect on Borrower.  Following any reasonable determination by Lender that there is noncompliance, or any condition which requires any action by or on behalf of Borrower in order to avoid noncompliance, with any Environmental Law, at Borrower's expense, cause an independent environmental engineer reasonably acceptable to Lender to conduct such tests of the relevant site(s) as are appropriate and prepare and deliver a report setting forth the results of such tests, a proposed plan for remediation and an estimate of the costs thereof.

(d)   **Inspection and Audits**.  Borrower shall permit Lender, or any Persons designated by it, to call at Borrower's places of business at any reasonable times and, without hindrance or delay, to inspect the Lenders' Collateral and to inspect, audit, check and make extracts from Borrower's books, records, journals, orders, receipts and any correspondence and other data relating to Borrower's business, the Lenders' Collateral or any transactions between the parties hereto, and shall have the right to make such verification concerning Borrower's business as Lender may consider reasonable under the circumstances.  Borrower shall furnish to Lender such information relevant to Lender's rights under this Agreement and the Other Agreements as Lender in its sole discretion, exercised in a commercially reasonable manner, shall at any time and from time to time request.  Lender, through its officers, employees or agents, shall have the right, at any time and from time to time, in Lender's name, to verify the validity, amount or any other matter relating to any of Borrower's Accounts, by mail, telephone,

19

telecopy, electronic mail or otherwise, provided that, prior to the occurrence of an Event of Default, Lender shall conduct such verification in the name of a nominee of Lender or in Borrower's name. Borrower authorizes Lender to discuss the affairs, finances and business of Borrower with any officers, employees or directors of Borrower or with its Parent or any Affiliate or the officers, employees or directors of its Parent or any Affiliate, and to discuss the financial condition of Borrower with Borrower's independent public accountants. Any such discussions shall be without liability to Lender or to Borrower's independent public accountants. Borrower shall pay to Lender its customary audit fee, currently $750 per day per auditor, not to exceed $21,000 in the aggregate per Fiscal Year absent an Event of Default, and all costs and out-of-pocket expenses incurred by Lender in the exercise of its inspection and audit rights provided for in this Section 12(d), and all of such fees, costs and expenses shall constitute Obligations hereunder, shall be payable on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder. Lender shall not conduct more than four (4) audits of Borrower per Fiscal Year absent the existence of an Event of Default.

(e)     **Insurance**. Borrower shall:

(i)     Keep the Lenders' Collateral properly housed and insured for the full insurable value thereof against loss or damage by fire, theft, explosion, sprinklers, collision (in the case of motor vehicles) and such other risks as are customarily insured against by Persons engaged in businesses similar to that of Borrower, with such companies, in such amounts, with such deductibles and under policies in such form as shall be satisfactory to Lender. Original (or certified) copies of such policies of insurance have been or shall be, within ninety (90) days of the date hereof, delivered to Lender, together with evidence of payment of all premiums therefor, and shall contain an endorsement, in form and substance acceptable to Lender in its sole discretion, exercised in a commercially reasonable manner, showing loss under such insurance policies payable to Lender (or, with respect to Term Lender Collateral, the Term Lender). Such endorsement, or an independent instrument furnished to Lender, shall provide that the insurance company shall give Lender at least thirty (30) days' written notice before any such policy of insurance is altered or canceled and that no act, whether willful or negligent, or default of Borrower or any other Person shall affect the right of Lender to recover under such policy of insurance in case of loss or damage. In addition, Borrower shall cause to be executed and delivered to Lender an assignment of proceeds of its business interruption insurance policies. Borrower hereby directs all insurers under all policies of insurance to pay all proceeds payable thereunder directly to Lender (or, with respect to Term Lender Collateral, to Term Lender). Borrower irrevocably makes, constitutes and appoints Lender (and all officers, employees or agents designated by Lender) as Borrower's true and lawful attorney (and agent-in-fact) for the purpose of making, settling and adjusting claims under such policies of insurance, endorsing the name of Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and making all determinations and decisions with respect to such policies of insurance, provided however, that if no Event of Default shall have occurred and is continuing, Borrower may make, settle and adjust claims involving less than Fifty Thousand and No/100 Dollars ($50,000) in the aggregate without Lender's consent.

20

(ii)    Maintain, at its expense, such public liability and third-party property damage insurance as is customary for Persons engaged in businesses similar to that of Borrower with such companies and in such amounts with such deductibles and under policies in such form as shall be reasonably satisfactory to Lender and original (or certified) copies of such policies have been or shall be, within ninety (90) days after the date hereof, delivered to Lender, together with evidence of payment of all premiums therefor; each such policy shall contain an endorsement showing Lender as additional insured thereunder and providing that the insurance company shall give Lender at least thirty (30) days' written notice before any such policy shall be altered or canceled.

If Borrower at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay any premium relating thereto, then Lender, without waiving or releasing any obligation or default by Borrower hereunder, may (but shall be under no obligation to) obtain and maintain such policies of insurance and pay such premiums and take such other actions with respect thereto as Lender deems advisable. Such insurance, if obtained by Lender, may, but need not, protect Borrower's interests or pay any claim made by or against Borrower with respect to the Collateral. Such insurance may be more expensive than the cost of insurance Borrower may be able to obtain on its own and may be cancelled only upon Borrower providing evidence that it has obtained the insurance as required above. All sums disbursed by Lender in connection with any such actions, including, without limitation, court costs, expenses, other charges relating thereto and reasonable attorneys' fees, shall constitute Loans hereunder, shall be payable on demand by Borrower to Lender and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

(f)    **Collateral**. Borrower shall keep the Lenders' Collateral in good condition, repair and order ordinary wear and tear excepted and shall make all necessary repairs to the Equipment and replacements thereof so that the operating efficiency and the value thereof shall at all times be preserved and maintained in all material respects. Borrower shall permit Lender to examine any of the Lenders' Collateral at any time and wherever the Lenders' Collateral may be located and, Borrower shall, promptly upon request therefor by Lender, deliver to Lender any and all evidence of ownership of any of the Equipment, including, without limitation, certificates of title and applications of title. Borrower shall, at the request of Lender, indicate on its records concerning the Collateral a notation, in form satisfactory to Lender, of the security interest of Lender hereunder. If, prior to the termination of this Agreement, Borrower shall obtain rights to any new Collateral of the type described in the last sentence of Subsection 11(b), Borrower shall notify Lender in writing (with reasonable detail) of such changes at least once every thirty (30) days. Borrower hereby authorizes Lender to unilaterally modify this Agreement by amending Schedule 11(b) to include any such Collateral. Notwithstanding the foregoing, Borrower hereby agrees that Lender's security interest shall extend to all such Collateral, regardless of whether Lender actually amends Schedule 11(b).

(g)    **Use of Proceeds**. All monies and other property obtained by Borrower from Lender pursuant to this Agreement shall be used solely for (i) payment of existing indebtedness of Borrower to Bank One and (ii) other business purposes of Borrower.

(h)    **Taxes**. Borrower shall file all required tax returns and pay all of its taxes when due, subject to any extensions granted by the applicable taxing authority, including,

21