IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:                                              | Chapter 11

CHAPCO CARTON COMPANY,                              | Case No. 04-26000

         Debtor.                                    | Hon. Bruce W. Black

STIPULATION AND FINAL ORDER (I) AUTHORIZING SECURED
POST-PETITION FINANCING ON A SUPERPRIORITY BASIS PURSUANT TO
11 U.S.C. § 364, (II) AUTHORIZING USE OF CASH COLLATERAL
PURSUANT TO 11 U.S.C. §§ 363 AND 364, AND (III) GRANTING ADEQUATE
PROTECTION PURSUANT TO 11 U.S.C. §§ 363 AND 364

Upon the emergency motion (the "Motion") dated July 13, 2004 of Chapco Carton

Company, the debtor and debtor in possession (the "Debtor"), (a) seeking this Court's

authorization  pursuant  to  Sections 363(c), 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of

Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy

Code") and Rules 2002, 4001(c) and 9014 of the Federal Rules of Bankruptcy Procedure (as

amended, the "Bankruptcy Rules"), for the Debtor, inter alia, (i) to obtain secured post-petition

financing (the "Post-Petition Financing") up to an aggregate principal amount not to exceed

$4,500,000 from Cole Taylor Bank ("Cole Taylor" or "Lender"), as lender, (ii) to grant the

Lender, pursuant to Bankruptcy Code §§ 364(c) and 364(d), security interests in all of the

Debtor's presently owned and after-acquired personal property and Pre-Petition Collateral (as

defined below) and (iii) to grant the Lender, pursuant to Bankruptcy Code § 364(c)(1), priority in

payment with respect to such obligations over any and all administrative expenses of the kinds

specified in Bankruptcy Code §§ 503(b) and 507(b), other than in respect of the Carve-Out (as

defined below); (b) seeking this Court's authorization, pursuant to Bankruptcy Code § 363(c), to

- 1 -

use the Cash Collateral (as defined below) and, pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d), to provide adequate protection to the Lender with respect to any diminution in the value of the Lender's interest in the Pre-Petition Collateral (as defined below) resulting from the priming liens and security interests to be granted herein pursuant to Bankruptcy Code § 364(d) to secure the Post-Petition Financing, the use of the Cash Collateral, the use, sale or lease of the Pre-Petition Collateral (other than the Cash Collateral) and the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a); (c) seeking a preliminary hearing (the "Preliminary Hearing") on the Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001, and (d) requesting that a final hearing (the "Final Hearing") be scheduled, and that notice procedures in respect of the Final Hearing be established by this Court to consider entry of a final order authorizing on a final basis, inter alia, the Post-Petition Financing and the use of the Cash Collateral (this "Order"); the Preliminary Hearing and the Final Hearing having been held before this Court; due and sufficient notice of the Motion and the Final Hearing under the circumstances having been given, an objection of IFC Credit Corporation ("IFC") having been filed and thereafter withdrawn and an objection of the Official Committee of Unsecured Creditors (the "Creditors' Committee") having been filed and thereafter withdrawn in part and otherwise overruled; and upon the entire record made at the Preliminary Hearing and the Final Hearing, and this Court having found good and sufficient cause appearing therefore,

THE DEBTOR AND THE LENDER STIPULATE AND THE COURT FINDS AND CONCLUDES THAT:

CHICAGO/#1270592.9

A.      On July 13, 2004 (the "Petition Date"), the Debtor filed its voluntary petition for relief with this Court under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").  The Debtor is continuing in possession of its property, and operating and managing its business, as a debtor in possession pursuant to Bankruptcy Code §§ 1107 and 1108.

B.      This Court has jurisdiction over the Chapter 11 Case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

C.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in paragraph 25), Debtor acknowledges and stipulates that from time to time prior to the Petition Date, Lender loaned money to or for the benefit of Debtor, pursuant to the terms and conditions of that certain Loan and Security Agreement, dated as of October 10, 2003 (the "Loan Agreement"),[1] and as further documented, recorded and evidenced by various other agreements, instruments, financing statements and documents entered into in connection with the Loan Agreement, all as may have been amended, modified or restated from time to time (collectively, including the Loan Agreement, the "Pre-Petition Agreements"), including, without limitation, that certain Intercreditor Agreement dated as of October 10, 2003, by and between Lender and IFC Credit Corporation (the "Intercreditor Agreement"):

D.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in paragraph 25), Debtor acknowledges and stipulates that, in accordance with the terms of the Pre-Petition Agreements, the Debtor is truly and justly indebted

---

[1]      Capitalized terms not otherwise defined herein shall have the definitions set forth in the Pre-Petition Agreements.

- 3 -

to the Lender, without defense, counterclaim or offset of any kind, and that as of July 12, 2004, (i) the Debtor was liable to the Lender in respect of loans made pursuant to the Pre-Petition Agreements in the aggregate principal amount of $3,641,713.18 (exclusive of interest and fees accrued and unpaid thereon and other costs, expenses and indemnities) (the "Pre-Petition Indebtedness"), and (iii) pursuant to the Pre-Petition Agreements, the Debtor was liable to the Lender for accrued and unpaid interest, commitment fees, attorneys' and advisors' fees, other out-of-pocket expenses, costs and indemnities.

E.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in paragraph 25), Debtor acknowledges and stipulates that under the Pre-Petition Agreements and as security for repayment of the Pre-Petition Indebtedness, Debtor granted to Lender security interests in, and liens upon, substantially all of its assets, as more fully described in the Pre-Petition Agreements, which are incorporated herein by reference (collectively, including the Cash Collateral (as defined below), the "Pre-Petition Collateral").

F.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in paragraph 25), Debtor acknowledges and stipulates that Lender's security interests in and liens on the Pre-Petition Collateral were properly perfected and are valid and enforceable first priority liens on and security interests in the Pre-Petition Collateral. Debtor further acknowledges that its cash constitutes proceeds of the Pre-Petition Collateral and, therefore, is cash collateral of the Lender within the meaning of Bankruptcy Code § 363(a) (the "Cash Collateral"). The Lender is entitled, pursuant to Bankruptcy Code §§ 361 and 363(e), to adequate protection of its interest in the Pre-Petition Collateral, including for the use of the Cash

- 4 -

Collateral, the use, sale or lease of the Pre-Petition Collateral other than the Cash Collateral and the imposition of the automatic stay.

G.     The Debtor does not have sufficient available sources of working capital and financing to operate its business in the ordinary course of business or operate its business and maintain its property in accordance with state and federal law without the Post-Petition Financing and the use of the Cash Collateral.   The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, to pay its employees and otherwise finance its operations, is essential to the Debtor's continued viability.   In addition, the Debtor's need for financing is immediate.   In the absence of the Post-Petition Financing and the use of the Cash Collateral, the continued operation of the Debtor's business would not be possible, and serious and irreparable harm to the Debtor and its estate would occur.   The preservation, maintenance and enhancement of the going concern value of the Debtor is of the utmost significance and importance to a successful reorganization of the Debtor under Chapter 11 of the Bankruptcy Code.

H.     Given the Debtor's current financial condition, financing arrangements and capital structure, the Debtor cannot obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense.   Financing on a post-petition basis is not otherwise available without the Debtor (i) granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below (a) in respect of the Carve-Out (as defined below); (b) in respect of proceeds of the Avoidance Actions in excess of the Avoidance Actions Lien Amount (as such terms are defined hereinafter), and (c) in respect of

- 5 -

Budgeted/Incurred Claims (as defined below); (ii) securing, pursuant to Bankruptcy Code §§ 364(c) and (d), such indebtedness and obligations with security interests in and liens on all of the Debtor's personal property, real property and the Pre-Petition Collateral as described below, and (iii) providing for adequate protection of the Lender's interests as described below.

I.     Notice of the Final Hearing and the relief requested in the Motion has been given to (i) the Office of the United States Trustee, (ii) counsel to the Lender, (iii) counsel to the Creditors' Committee, (iv) counsel to IFC (defined below), (v) the creditors holding the 20 largest unsecured claims against the Debtor, and (vi) all other parties having a lien on or security interest in the Debtor's assets or property.  Under the circumstances, such notice of the Final Hearing and the relief requested in the Motion constitutes adequate and sufficient notice under Bankruptcy Code §§ 102(1), 364(c) and 364(d) and Bankruptcy Rules 2002 and 4001, and no other notice need be given.

J.     At the Preliminary Hearing and the Final Hearing, the Court considered representations made by counsel, offers of proof, and/or testimony regarding:

(i)     the negotiations pertaining to this Order;

(ii)    the necessity for this Order;

(iii)   the events leading up to the filing of the Petition by Debtor;

(iv)    Debtor's need for credit to the extent necessary to avoid immediate and irreparable harm to the estate, pending a final hearing in accordance with Bankruptcy Rule 4001(c); and

(v)     those expenses necessary to avoid immediate and irreparable harm to the estate.

- 6 -

K.    Based on the record presented to the Court by the Debtor at the Preliminary Hearing and the Final Hearing, the Post-Petition Financing has been negotiated in good faith and at arm's length between the Debtor and the Lender, and any credit extended, and loans made to the Debtor pursuant to the Pre-Petition Agreements shall be deemed to have been extended, issued or made, as the case may be, in good faith by the Lender as required by, and within the meaning of, Bankruptcy Code § 364(e).

L.    Based on the record presented to the Court by the Debtor at the Preliminary Hearing and the Final Hearing, the terms of the Post-Petition Financing appear to be fair and reasonable, are ordinary and appropriate for secured financing to debtors in possession, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

M.    The Debtor has requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b) and (c). This Court concludes that entry of this Order is in the best interest of the Debtor's estate and creditors as its implementation will, among other things, provide the Debtor with the necessary liquidity to sustain the operation of the Debtor's business and enhance the Debtor's prospects for successful reorganization.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, EFFECTIVE IMMEDIATELY, AND AGREED AMONG THE PARTIES HERETO THAT:

1.    The Motion is granted, subject to the terms and conditions set forth in this Order.

2.    Debtor is hereby authorized to obtain the Post-Petition Financing, use Cash Collateral, and additionally to borrow money and seek other financial accommodations from the Lender after the Petition Date pursuant to the terms and conditions of this Order and the Pre-

- 7 -

Petition Agreements. The Lender shall be authorized to advance funds constituting Post-Petition

Financing, as limited by the Budget (as defined below) and subject to the terms and conditions of

this Order and the Pre-Petition Agreements, including, without limitation, the Maximum

Revolving Loan Limit of no greater than $4,800,000. The Debtor is authorized to use the

proceeds of any loans ("Loans") made under the Post-Petition Financing, to use the Cash

Collateral and any diminution in the value of the Collateral in the operation of the Debtor's

business (all such Loans, use of Cash Collateral, and any diminution in the Value of the

Collateral after the Petition Date collectively shall constitute, the "Post-Petition Indebtedness"),

provided, that (i) the proposed Loans or use of the Cash Collateral is consistent with the terms of

the Pre-Petition Agreements and this Order and will only be used to pay when due expenses set

forth in the Budget, and (ii) any requested Post-Petition Financing is necessary after the

application of available Cash Collateral.

3.     During the term of this Order, the terms of the Pre-Petition Agreements shall

continue in full force and effect with respect to the Loans and other advances under the

Post-Petition Financing except as otherwise modified herein, including, as follows:

a.     Overadvances. The second full paragraph Section 2(a) of the Loan

Agreement is hereby amended and restated in its entirety as follows:

"If at any time the aggregate principal amount of outstanding Revolving
Loans plus any Letter of Credit Obligations exceeds either (i) the Revolving Borrowing
Base Amount or any applicable sublimit within the Revolving Borrowing Base Amount
(individually, each an "Overadvance" and, collectively, the "Overadvances") or (ii) the
Maximum Revolving Loan Limit, except for any Overadvances hereinafter permitted,
Borrower shall immediately, and without the necessity of demand by Lender, pay to
Lender such amount as may be necessary to eliminate such excess and Lender shall apply
such payment to the Revolving Loans to eliminate such excess. Borrower shall be
allowed Overadvances (subject to the consent of Lender) during each period covered by a
Budget (as defined in the DIP Order) in an aggregate amount (including pre-petition and

- 8 -

post-petition advances) not to exceed the availability as set forth in the Budget, so long as (1) no Default or Event of Default is then existing or would result from any proposed Overadvance and (2) the aggregate principal amount of outstanding Revolving Loans and Letter of Credit Obligations (after giving effect to any proposed Overadvance) does not exceed the Maximum Revolving Loan Limit. Thus, for the period from July 13, 2004 to and including the last day of the Term (as defined in the DIP Order), Borrower would be permitted Overadvances in an aggregate amount not exceed $1,500,000, provided the conditions to such advances were satisfied. In addition, Lender may, in its sole discretion, permit any Overadvance (in any amount during any period) to remain outstanding and continue to advance Revolving Loans to Borrower so long as the aggregate principal amount of outstanding Revolving Loans plus the Letter of Credit Obligations does not exceed the Maximum Revolving Loan Limit, and Borrower shall immediately pay any such Overadvance upon the demand of Lender."

b.    Interest Rate. The first sentence of Section 4(a) of the Loan Agreement is hereby amended and restated in its entirety as follows:

"Each Revolving Loan shall bear interest at the rate of three percent (3.0%) per annum in excess of the Prime Rate in effect from time to time, payable on the last Business Day of each month in arrears; provided that, each Revolving Loan constituting an Overadvance shall bear interest at the rate of five percent (5%) per annum in excess of each the Prime Rate in effect from time to time payable on the last Business Day of each month in arrears."

c.    Facilities Fee. Section 4(c)(i) of the Loan Agreement is hereby amended and restated in its entirety as follows:

"[Intentionally Deleted]"

d.    Daily Reports. The first sentence of Section 9(a) of the Loan Agreement is hereby amended and restated in its entirety as follows:

"Borrower shall deliver to Lender an executed borrowing base certificate in the form of Exhibit A hereto each Business Day which shall be accompanied by copies of Borrower's sales journal, cash receipts journal and credit memo journal for the relevant period. Each such borrowing base certificate additionally shall be executed by the Restructuring Consultant (as defined in the DIP Order) certifying that such borrowing base certificate is in compliance with the terms of the Budget and this Agreement, as modified by DIP Order."

CHICAGO/#1270592.9

e.    Prepayment Fee.   Section 10 is hereby amended by deleting the last sentence of such Section in its entirety.

f.    Defined Terms.   Annex I is hereby amended by adding the following defined term:

> "DIP Order" shall mean that certain Stipulation and Interim Order (I) Authorizing Secured Post-Petition Financing on a Superpriority Basis Pursuant to 11 U.S.C. § 364, (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §§ 363 And 364, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364, and (IV) Scheduling A Final Hearing Pursuant to Bankruptcy Rule 4001(C), which such order is entered by the United States Bankruptcy Court in the Chapter 11 bankruptcy of Borrower, and any subsequent final order entered with respect thereto.

4.    In accordance with Bankruptcy Code § 364(c)(1) and subject to Paragraph 6 hereof, the Post-Petition Indebtedness shall constitute claims (the "Superpriority Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726, and shall at all times be senior to the rights of the Debtor, and any successor trustee or any creditor in the Chapter 11 Case or any subsequent proceedings under the Bankruptcy Code, provided, however, nothing contained herein shall serve to limit, restrict or adjudicate the rights of IFC to seek a claim pursuant to § 507(b) of the Bankruptcy Code (the "IFC 507(b) Claim"):  (a) with respect to its interests in the "IFC Collateral" as such term is defined in the Intercreditor Agreement, which if allowed, shall be subject and subordinate only to the Liens and Superpriority Claims of the Lender; and (b) with respect to its interests in property of the estate other than the IFC Collateral, which, if allowed, shall be subject and subordinate only to:  (i) the Liens and Superpriority

- 10 -

Claims of the Lender; (ii) the Budgeted/Incurred Claims (as defined below); (iii) the Carve-Out (as defined below) and (iv) the Authorized Fees (as defined below). IFC unconditionally and absolutely waives its rights to seek disgorgement, or otherwise participate or receive or share in, directly or indirectly, any proceeds from any attempt to seek disgorgement or return of expenditures made by the Debtor for the purposes described in subsections (b)(ii) and (iii) of this paragraph with respect to a claim under § 507(b) of the Bankruptcy Code arising out of its interests in property of the estate other than the IFC Collateral. Subject only to paragraph 6 hereof and the Intercreditor Agreement, if applicable, no cost or expense of administration under Bankruptcy Code §§ 105, 364(c)(1), 503(b), 506(c), 507(b) or otherwise, including those resulting from the conversion of the Chapter 11 Case pursuant to Bankruptcy Code § 1112, shall be senior to, or pari passu with, the Superpriority Claims of the Lender arising out of the Post-Petition Indebtedness. Notwithstanding the foregoing, the Superpriority Claims shall not include any proceeds of Avoidance Actions in excess of the Avoidance Actions Lien Amount (as such terms are defined hereinafter). Except with respect to the Liens and Superpriority Claims granted to the Lender herein, nothing contained in this Order shall constitute the granting of any priority or super-priority claim or lien to or for the benefit of any entity, including the Committee or any professional retained in the case, or otherwise effect the priority for such claims or expenses provided under the Bankruptcy Code, including with respect to the Carve-Out and the Budgeted/Incurred Claims.

5.      As security for the Post-Petition Indebtedness, the Lender shall have and is hereby granted (effective upon the date of this Order and without the necessity of the recordation of mortgages, security agreements, pledge agreements, financing statements or otherwise), valid

CHICAGO/#1270592.9

and perfected security interests in, and liens on (collectively, the "Liens"), all assets of the Debtor of any nature whatsoever and wherever located, tangible or intangible, whether now or hereafter acquired, including, without limitation, accounts, inventory, instruments, investment property, documents, equipment (except for the IFC Collateral as defined in the Intercreditor Agreement to the extent set forth in the Intercreditor Agreement), fixtures, general intangibles, and any and all proceeds of the foregoing, a pledge of the Debtor's capital stock, causes of action and any avoidance actions under Bankruptcy Code §§ 544, 545, 547, 548, 549, 550 or 553 and the proceeds thereof ("Avoidance Actions") (provided, however, that the Liens shall attach to Avoidance Actions only to the extent that (a) the Post-Petition Indebtedness as of the earlier of the end of the Term or the Early Termination Date, exceeds the Pre-Petition Indebtedness as of the Petition Date (collectively, the "Avoidance Actions Lien Amount"), investment property, leases and all substitutions thereto, accessions, rents and proceeds of the foregoing, wherever located, including insurance and other proceeds (collectively, with all proceeds and products of any or all of the foregoing and including the Pre-Petition Collateral, the "Collateral"):

      a.     pursuant to Bankruptcy Code § 364(c)(2), a first priority, perfected Lien upon all of the Debtor's right, title and interest in, to and under all Collateral that is not otherwise encumbered by a validly perfected security interest or lien on the Petition Date;

      b.     pursuant to Bankruptcy Code § 364(d)(1), a first priority, senior perfected Lien upon all of the Debtor's right, title and interest in, to and under the Pre-Petition Collateral, provided that such first priority senior Lien shall be subject to any prior liens of third parties that exist pursuant to law which were properly perfected prior to the Petition Date, including, without limitation, the lien of IFC in and to the IFC Collateral

- 12 -

(as defined in the Intercreditor Agreement) to the extent that its lien was properly perfected prior to the Petition Date (collectively, the "Prior Permitted Liens"); and

c.      pursuant to Bankruptcy Code § 364(c)(3), a second priority, junior perfected Lien upon all of the Debtor's right, title and interest in, to and under all other Collateral which is subject to Prior Permitted Liens, or any valid lien perfected (but not granted) after the Petition Date to the extent such perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code.

Except to the extent expressly set forth in clauses (b) and (c) of this paragraph and subject to the Budgeted/Incurred Claims (as defined below) and paragraph 6 hereof and the Intercreditor Agreement (solely with respect to the IFC Collateral as defined in the Intercreditor Agreement), the Liens granted pursuant to this Order and the Pre-Petition Agreements to the Lender to secure the Post-Petition Indebtedness shall not be subordinated to or made pari passu with any other lien or security interest. The provisions of any intercreditor agreements or subordination agreements which subordinate liens and security interests to the liens and security interests of the Lender or other indentures which subordinate any claims to the claims of the Lender shall remain in full force and effect and shall continue with respect to the liens and security interests granted to the Lender in the Collateral, including, without limitation, the Intercreditor Agreement.

6.      Any provision of this Order or the Pre-Petition Agreements to the contrary notwithstanding, the Liens and Superpriority Claims granted to the Lender pursuant to the Pre-Petition Agreement and this Order shall be subject and subordinate to (i) Budgeted/Incurred Claims (as defined below), and (ii) a Carve-Out (the "Carve-Out") for (a) following the Debtor's and Creditors' Committee's receipt of written notice of the occurrence and during the pendency

- 13 -

of a Default or an Event of Default (as each such term is defined in the Pre-Petition Agreements or in this Order) ("Notice of Default"), the payment of allowed and unpaid professional fees and disbursements incurred by the professionals retained, pursuant to Bankruptcy Code §§ 327 or 1103(a), by the Debtor and the Creditors' Committee and any disbursements of any member of the Creditors' Committee, in the amounts not to exceed $50,000 for the Debtor's attorneys, $75,000 for the Debtor's financial consultants, and $30,000 for the Creditors' Committee's professionals and members of the Creditors' Committee, less in each case any respective unapplied retainers and escrowed amounts; and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court; provided, however, (x) following the earlier of the expiration of the Term or the Early Termination Date (as such terms are defined hereinafter), any Cash Collateral (as it exists on such date) shall not be subject to the Carve-Out, but any professional fee or Creditors' Committee member expense incurred after the Petition Date and prior to the earlier of the expiration of the Term or the Early Termination Date shall remain subject to the respective Carve-Out and paid from the proceeds of the Collateral other than the Cash Collateral in existence at the earlier of the expiration of the Term or the Early Termination Date and (y) notwithstanding anything herein to the contrary, no Loans, Collateral, Cash Collateral, or any portion of the Carve-Out may be used to object to or contest in any manner, or raise any defenses to, the amount, validity, perfection, priority, extent or enforceability of the Pre-Petition Indebtedness or the liens securing the Pre-Petition Indebtedness or to assert any claims or causes of action against the Lender, provided, however, that the Creditors' Committee may use a portion of its Carve-Out to investigate any possible claims or causes of action against the Lender, which such amount used shall reduce its

- 14 -

Carve-Out and (z) other than for Lender, this Order shall not constitute the granting of any priority or super-priority claim or lien to any entity, including the Committee or any professional retained in the case. During the Term, as long as no Notice of Default shall have been received by the Debtor, Debtor shall be permitted to pay budgeted compensation and reimbursement of expenses, allowed and payable under Bankruptcy Code §§ 330 and 331, as the same may be payable, provided that amounts may be subject to disgorgement in accordance with the provisions of the Bankruptcy Code. The Lender shall not seek disgorgement (except for fraud or willful misconduct) of any fees or expenses for the Debtor's professionals or the Creditors' Committee's professionals which were (i) budgeted, actually paid and previously allowed by the Court under Bankruptcy Code §§ 330 and 331 prior to a Notice of Default being received by the Debtor and the Creditor's Committee, or (ii) budgeted, actually paid and provisionally allowed pursuant to the Order Establishing Procedures for the Payment of Monthly Interim Compensation and Reimbursement of Expenses of Professionals entered on July 29, 2004 prior to a Notice of Default being received by the Debtor and the Creditors Committee, which are finally allowed by the Court (collectively, the "Authorized Fees").

7.    Immediately upon entry of this Order, the Debtor is hereby authorized to use Cash Collateral, provided that the Lender is granted adequate protection for any diminution in the value of the Collateral resulting from (i) the liens and security interests granted by the Post-Petition Financing and this Order or otherwise pursuant to Bankruptcy Code § 364(d), (ii) the Debtor's use of the Cash Collateral pursuant to Bankruptcy Code § 363(c), (iii) the use, sale or lease of the Collateral (other than the Cash Collateral) pursuant to Bankruptcy Code § 363(c) and (iv) the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a):

- 15 -

a.      the Lender shall be and hereby is granted (effective upon the date of this Order and without the necessity of the execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements or otherwise), valid and perfected, replacement security interests in, and liens on (the "Replacement Liens"), all of the Debtor's right, title and interest in, to and under the Collateral, subject only to (i) the Carve-Out; (ii) the Budgeted/Incurred Claims (as defined below); (iii) the Liens granted to Lender pursuant to this Order to secure the Post-Petition Indebtedness, and (iv) any Prior Permitted Liens; and

b.      the Lender shall be and hereby is granted, pursuant to Bankruptcy Code § 364(c)(1), Superpriority Claims, junior only to (i) the Superpriority Claims granted pursuant to this Order to the Lender in respect of the Post-Petition Financing and (ii) the rights of IFC under the Intercreditor Agreement (to the extent applicable); and limited with respect to Avoidance Actions to the Avoidance Actions Lien Amount.

8.      Under the circumstances, the adequate protection provided herein is reasonable and sufficient to protect the interests of the Lender; provided, however, that nothing herein contained shall affect or impair Lender's right to seek additional adequate protection of its interests. Notwithstanding any other provision hereof, the grant of adequate protection to the Lender pursuant hereto is without prejudice to IFC or any other holders of any Prior Permitted Liens to seek adequate protection of their interests or to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtor or any other party in interest to contest any such modification.

- 16 -

9.      Except as set forth in paragraphs 5, 6 and 7 hereof, the Liens and Replacement Liens shall be prior and senior to all liens and encumbrances (other than Prior Permitted Liens) of all other secured creditors in and to such Collateral granted, or arising, after the Petition Date (including, without limitation, liens and security interests, if any, granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor). The Liens and Replacement Liens granted pursuant to this Order shall constitute valid and duly perfected security interests and liens, and the Lender shall not be required to file or serve financing statements, notices of lien or similar instruments in respect of the Pre-Petition Indebtedness which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtor to execute any documentation relating to the Liens or Replacement Liens shall in no way affect the validity, perfection or priority of such Liens or Replacement Liens. If, however, the Lender at its sole discretion shall determine to file any such financing statements, notices of lien or similar instruments, or to otherwise confirm perfection of such Liens or Replacement Liens, the Debtor is directed to cooperate with and assist in such process, the stay imposed by Bankruptcy Code § 362(a) is hereby lifted to allow the filing and recording of a certified copy of this Order or any such financing statements, notices of lien or similar instruments, and all such documents shall be deemed to have been filed or recorded at the time of and on the date of this Order.

10.     From and after August 19, 2004, proceeds or payments received by Lender with respect to the Collateral upon which Lender had security interests or liens shall be applied by Lender as follows:

- 17 -

CHICAGO/#1270592.9

a. first, to the payment of all costs, fees and expenses, including attorneys' fees of the Lender;

b. second, to the payment of Post-Petition Indebtedness including all accrued and accruing interest;

c. third, to the payment of the Post-Petition Indebtedness consisting of principal;

d. fourth, to the payment of Pre-Petition Indebtedness consisting of accrued and accruing interest; and

e. fifth, to the payment of Pre-Petition Indebtedness consisting of principal.

If, in the course of this Chapter 11 Case, and contrary to the above provisions, the Court grants liens or security interests to any entity other than IFC with respect to the IFC Collateral (as defined in the Intercreditor Agreement), pursuant to Bankruptcy Code § 364(d) or any other provision of the Bankruptcy Code, which liens or security interests are senior or equal to the liens or security interests of Lender in the Collateral described above (collectively, "Subsequent Liens"), then any proceeds of loans or extensions of credit secured by such Subsequent Liens shall be applied first to payment of the Pre-Petition Indebtedness, including all attorneys' fees, costs and expenses, and Lender shall retain all liens and security interests held by them on the Collateral until all of the Pre-Petition Indebtedness is paid in full, and then to the Post-Petition Indebtedness. For all of the Lender's expenses paid from and after the date of this Final Order (i) the Lender shall provide five (5) business days' advance written notice of such amounts, along with a summary of such charges, to the Debtor, IFC and the Creditors' Committee, (ii) during such five (5) business day period (the "Expense Review Period") the Debtor, IFC and

- 18 -

the Creditors' Committee may review the Lender's expenses solely for the purpose of determining their reasonableness, (iii) if the Debtor, IFC or the Creditors' Committee asserts that any such expenses are not reasonable, in order to preserve such objection, the Debtor, IFC or the Creditors' Committee, as applicable, must provide written notice to the Lender by the end of the Expense Review Period detailing with specificity the objection to the reasonableness of any Lender expense (a "Lender Expense Objection"), (iv) if any Lender Expense Objection cannot be resolved by the parties within five (5) business days after the conclusion of the Expense Review Period, the Debtor or the Creditors' Committee, as applicable, may either waive the Lender Expense Objection or file the applicable Lender Expense Objection with the Court, and (v) pending a Court resolution of a Lender Expense Objection, the Debtor shall promptly pay the Lender's expenses at issue, subject to the objecting party's right to seek the disallowance, disgorgement or recharacterization of such payment.

11.  Attached hereto as Exhibit A is a four (4) week Budget (the "Budget") for the period from September 28, 2004 through and including October 30, 2004, which has been consented to by the Lender. For each following four-week period, the Debtor shall provide the Lender and the Creditors' Committee with a revised Budget covering the succeeding four-week period by no later than the tenth (10th) day before the end of the existing Budget period, each Budget shall remain subject to Lender's consent before it becomes effective, and shall be further subject to the Creditors' Committee's or IFC's right to file an objection as set forth in paragraph 30 herein. The Budget reflects, on a line-item basis, anticipated expenditures on a weekly basis and includes all necessary and required expenses which Debtor expects to incur during each week of the Budget, and also reflects the Total Cash Collections estimated for each week of the Budget.

- 19 -

Debtor shall be authorized to use the proceeds of the Post-Petition Indebtedness and the Collateral only for payment of such items as is set forth in the Budget and subject to the terms and conditions set forth in the Pre-Petition Agreements and this Order. Not later than the second (2nd) business day of each week, Debtor shall provide to the Lender, IFC and the Creditors' Committee a variance report reflecting, on a line-item basis, the actual cash receipts and disbursements for the preceding week and the percentage variance (the "Variance Percent") of such actual receipts and disbursements from those reflected in the Budget for that period. Any disbursement by Debtor other than for such expenses set forth in the operative Budget within the Variance Percent shall constitute an Event of Default in accordance with the provisions of this Order unless Lender consents to those changes in writing; provided, however, that Debtor may make payments in excess of the total budgeted disbursements for the applicable week so long as (i) actual disbursements for each of the following three categories of budgeted disbursements (Purchasing Disbursements, Manufacturing Overhead, and Selling & Administrative) do not exceed one hundred and five percent (105%) of the budgeted disbursements for such categories as measured for any consecutive four-week period of the Budget; and (ii) the aggregate of all actual disbursements do not exceed one hundred and five percent (105%) of the aggregate of all budgeted disbursements as measured for any consecutive four-week period of the Budget (subsections (i) and (ii) above are collectively, the "Allowed Disbursement Variance"), provided further however, that the Allowed Disbursement Variance calculation shall not include or apply to budgeted expenses for the Debtor's or Creditors' Committee's professional fees, group insurance and utility deposits, which shall be limited to the amounts budgeted. In the event that the actual Net Sales for any consecutive four-week period exceeds the estimated Net Sales for

- 20 -

such period, the dollar amount of such excess shall be multiplied by 65%, and that total shall be added to the aggregate budgeted disbursement amount for the purposes of calculating the Allowed Disbursement Variance. In addition, for any consecutive four-week period of the Budget, (i) the actual Total Cash Collections received must be no less than ninety (90%) percent of the estimated Total Cash Collections reflected in the Budget and (ii) the actual Net Sales made must be no less than ninety (90%) percent of the estimated Net Sales reflected in the Budget (subsections (i) and (ii) above are collectively, the "Allowed Sales/Collections Variance"). The failure of the Debtor to remain within the Allowed Sales/Collections Variance or the Allowed Disbursement Variance shall constitute an Event of Default in accordance with the provisions of this Order. All disbursements by the Debtor shall be reviewed and approved in advance of payment by the Restructuring Consultant (as defined below) to ensure that such disbursements are in compliance with the Budget. The Restructuring Consultant shall immediately notify Lender, IFC and the Creditors' Committee of any disbursements made or proposed to be made that, if paid, would not be in compliance with the Budget. The Restructuring Consultant shall, by the second business day of each week, provide Lender, IFC and the Creditors' Committee with a certification in form and substance satisfactory to Lender that all disbursements made by the Debtor during the preceding week were compliance with the Budget.

12.    The Debtor shall continue its cash management system, which shall include a lockbox/blocked account agreement in a form and substance reasonably acceptable to Lender, pursuant to which Lender will have full dominion and control over the Cash Collateral and the cash proceeds of the Collateral.

13.    Immediately upon the entry of this Order, Debtor shall account to Lender for all cash, checks, notes, drafts, instruments, acceptances or other property representing cash or other proceeds of the Pre-Petition Collateral in Debtor's possession or control.  All cash, checks, notes, drafts, instruments, acceptances and other property in the nature of items of payment representing proceeds of property and interests in property of Debtor (collectively, "Cash Proceeds") currently in the possession of Debtor or in any accounts in financial institutions, including any lock box or depository accounts, shall be deemed proceeds of the Collateral.  All Cash Proceeds shall be remitted to Lender in accordance with the terms of this Order and subject to Paragraph 10 hereof.

14.    The agreement by the Lender to make any Post-Petition Financing available to Debtor under the Pre-Petition Agreements and to allow the use of its Cash Collateral and the Collateral shall continue until and shall include December 31, 2004 or such earlier date as all Pre-Petition Indebtedness and Post-Petition Indebtedness is paid in full (the "Term"), unless terminated prior to this date upon the occurrence of the Termination Date or otherwise pursuant to the terms of the Pre-Petition Agreements or this Order (the "Early Termination Date").

15.    If a Default or an Event of Default (as defined in the Pre-Petition Agreements or in this Order) occurs and upon Lender providing five (5) business days' written notice to Debtor and its counsel, the United States Trustee, counsel to the Creditors' Committee, and counsel for IFC, the Lender may terminate the Post-Petition Financing (the date of any such termination, the "Termination Date") and declare the Loans to be immediately due and payable, the Debtor's right to use Cash Collateral shall terminate automatically, and the automatic stay pursuant to Bankruptcy Code § 362(a) shall be deemed lifted and modified, without further order of this

- 22 -

Court, to permit the Lender and IFC to exercise any and all of their rights and remedies under the Pre-Petition Agreements, the Intercreditor Agreement, if applicable, and this Order; provided, however, that the obligations and rights of the Lender, IFC and the Debtor with respect to all transactions which have occurred prior to the Termination Date, including, without limitation, the Lender's security in Collateral and Debtor's right after notice and a hearing to (i) use Cash Collateral, (ii) reinstate, or defend against the lifting of, the automatic stay, or (ii) contest the existence of a Default or Event of default, shall remain unimpaired and unaffected by any such termination and shall survive such termination; and provided further that upon such termination the Lender, the Debtor, and IFC shall be deemed to have retained all of their rights and remedies, including, without limitation, those provided pursuant to the Pre-Petition Agreements, the Intercreditor Agreement, this Order and Bankruptcy Code, and Debtor's right after notice and a hearing to (i) request the use of Cash Collateral, (ii) seek to reinstate, or defend against the lifting of, the automatic stay, or (iii) contest the existence of a Default or Event of Default. In the event the automatic stay is reinstated against the Lender pursuant to an Order of the Court, then, in such event, the automatic stay shall be deemed reinstated against IFC without further act or deed or order of the Court (collectively, the "Automatic Stay Reinstatement"), subject to the rights of the Lender and IFC to seek modification of the automatic stay under the Bankruptcy Code.

16.    An Event of Default under this Order shall include: (i) the entry of an order dismissing the Chapter 11 Case or converting the Chapter 11 Case to a Chapter 7 case, (ii) the entry of an order appointing a Chapter 11 trustee in the Chapter 11 Case, (iii) the entry of an order granting any other claim superpriority status or a lien equal or superior to the liens granted to the Lender, (iv) the entry of an order staying, reversing, vacating or otherwise modifying the

- 23 -

Post-Petition Financing, this Order without the Lender's prior written consent, (v) the entry of an order in the Chapter 11 Case appointing an examiner having enlarged powers beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4), (vi) an Event of Default under the Pre-Petition Agreements (except for the Events of Default under Section 15(g) or (h) of the Loan Agreement), (vii) any material representation or material warranty by Debtor that is incorrect or misleading in any material respect when made, (viii) there shall occur a material disruption (or change that is unacceptable to Lender) in the senior management of Debtor or a change of control shall occur other than pursuant to a plan in which the Lender is repaid in full, (ix) there shall be any material adverse change in the financial condition, business, operations, properties or performance of Debtor, (x) the entry of any order granting any relief from the automatic stay so as to allow a third party to proceed against any material asset or assets of Debtor, other than relating to assets subject to Prior Permitted Liens which if granted will not materially or adversely affect current operations, (xi) the assertion by Debtor of claims arising under Bankruptcy Code § 506(c) against the Lender, or the commencement of any action by any other party in interest against the Lender or any portion of the Collateral, or which otherwise seeks to materially effect Lender's rights and remedies under this Order, the Final Order or any other Bankruptcy Court order, (xii) the failure to meet any of the requirements set forth in Paragraph 21 herein, (xiii) the failure to pay in full the Pre-Petition Indebtedness and the Post-Petition Indebtedness on or before the last day of the Term; or (xiv) the actual expenditures of the Debtor is in excess of the maximum allowable Variance Percentage as set forth in Paragraph 11 herein.  The term "Default" means the occurrence of any event which except for

- 24 -

the passage of time or the giving of notice or both would constitute an Event of Default (as defined in the Pre-Petition Agreements or in this Order).

17. Subject to the Automatic Stay Reinstatement, upon the occurrence of a Default or an Event of Default, the Lender and/or IFC may exercise their respective rights and remedies and take all or any of the following actions without further modification of the automatic stay pursuant to Bankruptcy Code § 362 which is hereby deemed modified and vacated to the extent necessary to permit such exercise of rights and remedies and the taking of such actions and without further order of or application to this Court: (a) suspend all Post-Petition Financing and Loans to the Debtor, and enjoin and prohibit Debtor from using Cash Collateral to the extent that such Default or Event of Default would permit such relief under the Pre-Petition Agreements, as amended hereby; (b) setoff amounts in any accounts maintained with the Lender, or otherwise enforce rights against all or part of any Collateral in the possession of the Lender to the extent that such Default or Event of Default would permit such relief under the Pre-Petition Agreements, as amended hereby; and/or (c) subject to the provisions of paragraph 15 above, take any other action or exercise any other right or remedy of the Lender or IFC under the Pre-Petition Agreements, the Intercreditor Agreement, if applicable, this Order or by operation of law. Upon the Debtor's receipt of written notice of an Event of Default, it shall immediately cease making any disbursements pursuant to the Budget or otherwise, subject to its rights as set forth in this Paragraph and Paragraph 15 above, provided, however, that notwithstanding the Lender's Liens and Superpriority Claims, the Debtor shall be authorized to pay Budgeted expenses (for that week or earlier weeks) for goods or services that were actually received by the Debtor before its receipt of a Notice of Default, except that no such Budgeted expenses may be

- 25 -

paid to any insiders of the Debtor or any professionals employed in this Chapter 11 Case pending further Order of Court and subject to the Carve-Out.   For the purposes hereof, the term "Budgeted/Incurred Claims" shall mean goods or services actually received by the Debtor before its receipt of a Notice of Default, other than payments to insiders and payments for compensation and reimbursement of expenses to the Creditors' Committee and professionals retained by the Debtor and the Creditors' Committee which shall be paid solely in accordance with the terms of the Carve-Out.

18.    Without further order of this Court, and in consideration of other accommodations provided by the Lender, the Debtor shall reimburse the Lender for all reasonable out-of-pocket filing and recording fees, reasonable attorneys' and paralegals' fees, costs and expenses and internal audit fees and expenses incurred by the Lender: (i) in the preparation and implementation of this Order and the various Loans and other Post-Petition Financing, (ii) in the representation of the Lender in this proceeding, and (iii) as otherwise provided in the Pre-Petition Agreements.  Subject to the Lender's discretion, the reimbursement contemplated hereby may be made by deducting such amounts from collections of the Lender or by adding such amounts to the Post-Petition Indebtedness.  Further, the Lender shall be paid (a) a closing fee of 1.5% of the Maximum Loan Limit, which shall be payable immediately upon entry of the interim Order approving the Motion (which Lender acknowledges has already been paid); (b) a monthly facility fee of $4,000, which shall be payable on the first day of every month that the Lender is providing Post-Petition Financing; and (c) an exit fee of 5% of the average Post-Petition Indebtedness that was incurred between the Petition Date and the Termination Date, which shall be payable immediately upon the earlier of the last day of the Term or the Termination Date.

- 26 -

The foregoing fees shall be deemed earned upon the entry of this Order and shall constitute Post-Petition Indebtedness of the Debtor.

19.     The Debtor is hereby required to deliver to the Lender and the Creditors' Committee such other financial and other information concerning the business and affairs of the Debtor as the Lender and the Creditors' Committee shall reasonably request from time to time, including, without limitation, the financial reports and information provided to the Lender under the Pre-Petition Agreements. The Debtor shall fully cooperate with and permit Lender to perform physical inventories of all assets in the Debtor's facilities at any reasonable times requested by Lender. The Debtor shall further provide the Lender with (a) detailed information as to the extent and composition of the Collateral and any collections thereon; (b) a weekly report, with information reasonably satisfactory to the Lender, identifying and differentiating accounts receivable and inventory collateral; (c) a weekly revenue report (including reports of sales); and (d) a weekly report of actual expenditures versus Budget expenditures.

20.     Having been found to be extending credit and making Loans to the Debtor in good faith, the Lender shall be entitled to the full protection of Bankruptcy Code § 364(e) with respect to the Post-Petition Financing and the Liens created or authorized by this Order in the event that this Order or any authorization contained herein is stayed, vacated, reversed or modified on appeal. Any stay, modification, reversal or vacation of this Order shall not affect the validity of any obligation of the Debtor to the Lender incurred pursuant to this Order. Notwithstanding any such stay, modification, reversal or vacation, all Loans made pursuant to this Order, all use of the Cash Collateral and all other Post-Petition Financing incurred by the Debtor pursuant hereto or the Pre-Petition Agreements prior to written notice to the Lender of

- 27 -

the effective date of any such stay, modification, reversal or vacation, shall be governed in all respects by the provisions hereof and the Lender shall be entitled to all the rights, privileges and benefits, including without limitation, the Liens, Replacement Liens and Superpriority Claims granted herein.

21.    The Lender's funding of any Loans or advances from and after the Petition Date (the "Post-Petition Advances") shall be subject to the following benchmarks to entertain offers for the sale of Debtor's assets: (i) on or before September 24, 2004, the Debtor shall cause the Restructuring Consultant to prepare and complete a marketing/sales book to present to potential buyers of the Debtor's assets, and by such date distribute such marketing/sales book to potential buyers to entertain offers to purchase the Debtor's assets; (ii) Debtor shall cause the Restructuring Consultant to provide Lender, IFC and the Creditors Committee with a weekly written report of all potential buyers, the status of any communications/negotiations with such potential buyers, and copies of any written offers submitted by any potential buyers.    The Lender's funding of any Loans or advances hereunder shall be further subject to the execution and delivery of a non-compete agreement by Charles Kiolbasa in form and substance satisfactory to Lender relating to the potential sale of the Debtor's assets on or before October 7, 2004, and which non-compete agreement is approved by the Bankruptcy Court no later than October 14, 2004.

22.    The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization in the Chapter 11 Case (and the Post-Petition Financing shall not be discharged by the entry of any such order or pursuant to Bankruptcy Code § 1141(d)(4), the Debtor having hereby waived such

- 28 -

discharge); (b) converting the Chapter 11 Case to a Chapter 7 case; or (c) dismissing the Chapter 11 Case, and the terms and provisions of this Order as well as the Superpriority Claims, Liens and Replacement Liens granted pursuant to this Order and the Pre-Petition Agreements shall continue in full force and effect notwithstanding the entry of such order, and such Superpriority Claims, Liens and Replacement Liens shall maintain their priority as provided by this Order until all Pre-Petition Indebtedness and all Post-Petition Indebtedness are indefeasibly paid in full and discharged.

23.    The Lender's obligations under this Order are conditional upon and subject to the delivery to the Lender of (i) evidence satisfactory to the Lender and IFC that their respective Collateral is insured for the full replacement value thereof and Lender is named as loss payee and/or as additional insured on all insurance policies; (ii) a reaffirmation by Charles Kiolbasa in form and substance satisfactory to Lender of his Non-Recourse Guaranty and Pledge Agreement and of his Continuing Unconditional Guaranty of any and all indebtedness of the Debtor to the Lender in a principal amount not to exceed $1,000,000 plus interest and costs and expenses of collection; (iii) an assignment in form and substance satisfactory to Lender of the proceeds of a life insurance policy insuring the life of Charles Kiolbasa in an amount not less than $2,000,000, which insurance policy shall be separate and distinct from the one assigned to IFC; and (iv) the Debtor's engagement in this Chapter 11 Case of its prepetition workout and restructuring consultant, Kugman Associates, or another workout and restructuring consultant acceptable to Lender (the "Restructuring Consultant") under terms and conditions acceptable to Lender, which shall include, without limitation, the Lender's and the Creditor's Committee's full access to all reports and information obtained, prepared or reviewed by the Restructuring Consultant.

- 29 -

Notwithstanding subsection (iv) of this paragraph, the Lender may retain at Debtor's sole expense, third party consultants selected by the Lender to review matters pertaining to the business and properties of the Debtor (the "Lender's Consultants"). Debtor will permit the Lender's Consultants, IFC and the Creditor's Committee to examine the respective corporate, financial and operating records, and, at the Debtor's expense, make copies thereof, inspect the assets, properties, operations and affairs of the Debtor, visit any or all of the offices of the Debtor to discuss such matters with its officers, independent auditors or the Restructuring Consultant (and the Debtor hereby authorizes such independent auditors and the Restructuring Consultant to discuss such matters with the Lender's Consultants), and the Debtor will cooperate with the Lender's Consultants in all respects.

24.    In consideration for the Post-Petition Financing, Debtor on behalf of itself and its successors and assigns (collectively, the "Releasors"), but without prejudice to the rights of the Creditors' Committee or any other party in interest to assert claims on behalf of the Debtor's estate (subject to Paragraph 25 below), shall forever release, discharge and acquit Lender and its officers, directors, employees, agents, attorneys and predecessors in interest (collectively, the "Releasees") of and from any and all claims, demands, damages, liabilities, responsibilities, disputes, remedies, actions, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" claims or defenses, which arose on or prior to the date this Order is entered with respect to Debtor, the Pre-Petition Indebtedness, the Collateral, the Pre-Petition Agreements, the Post-Petition Indebtedness or the Post-Petition Financing.

25.    The findings contained in recital paragraphs of this Order shall be binding upon all parties in interest, including without limitation, the Debtor, the Creditors' Committee, IFC and any statutory committees appointed in the Chapter 11 Case, unless (a) a party in interest (including any statutory committee appointed in the Chapter 11 Case) has properly filed an adversary proceeding or commenced a contested matter (subject to the limitations set forth in paragraph 6) challenging the amount, validity, enforceability, perfection or priority of the Pre-Petition Indebtedness, the Lender's liens on the Pre-Petition Collateral in respect thereof, or otherwise asserting any claims or causes of action against the Lender relating to the Pre-Petition Indebtedness on behalf of the Debtor's estate, no later than the date that is seventy-five (75) days after the formation of the Creditors' Committee, and (b) the Court subsequently enters a judgment in favor of the plaintiff in any such timely and properly filed adversary proceeding or contested matter.  If no such adversary proceeding or contested matter is properly commenced as of such date: (a) the Pre-Petition Indebtedness shall constitute an allowed claim, not subject to subordination and otherwise unavoidable, and (b) for all purposes in the Chapter 11 Case and any subsequent Chapter 7 case, the Lender's liens on the Pre-Petition Collateral shall be deemed legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind, subordination and otherwise unavoidable, and the Lender, the Pre-Petition Indebtedness and the Lender's liens on the Pre-Petition Collateral shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtor's estate, including, without limitation, any successor thereto.  If any such adversary proceeding or contested matter is properly commenced as of such date, the findings contained in the recital paragraphs of this Order shall nonetheless remain binding on all parties in interest except to the extent that such

- 31 -

findings were expressly challenged in such adversary proceeding or contested matter. Notwithstanding the 75-day deadline in this paragraph, to the extent that the Creditors' Committee believes that the Lender is undersecured with respect to the Pre-Petition Indebtedness, the Creditors' Committee may seek to recharacterize any postpetition interest paid to Lender by properly filing an adversary proceeding or contested matter seeking such relief by the earlier of: (i) the entry of an order confirming a plan of reorganization in this Chapter 11 Case, (ii) the entry of an order dismissing this Chapter 11 Case, and (iii) the entry of an order converting this Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code.

26.     Entry of this Order shall be without prejudice to any and all rights, remedies, claims and causes of action which the Lender may have against the Debtor or any third parties, and without prejudice to the right of the Lender to seek relief from the automatic stay in effect pursuant to Bankruptcy Code § 362, or any other relief in the Chapter 11 Case, and the right of the Debtor to oppose any such relief by contesting, _inter alia_, the existence of a Default or an Event of Default and as otherwise consistent with the terms of this Order.  The provisions of this Order shall be binding upon and inure to the benefit of the Lender and its successors and assigns, and the Debtor, and its successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Case as a legal representative of the Debtor or the Debtor's estate.

27.     In no event shall the Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any Collateral.

28.     The Debtor is authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements in addition to the Pre-Petition Agreements, as the Lender may reasonably require, as evidence of and for the protection of the

- 32 -

Post-Petition Financing, or which otherwise may be deemed reasonably necessary by the Lender to effectuate the terms and conditions of this Order and the Pre-Petition Agreements.

29.    To the extent there exists any conflict between the Pre-Petition Agreements and the terms of this Order, this Order shall govern.

30.    The Creditors' Committee and IFC shall have the right to object to any revised four-week Budget set forth in paragraph 11 hereof, by providing the Debtor, IFC or the Creditors' Committee (as appropriate), and the Lender with a written objection, stating the basis for such objection with specificity, at least five (5) business days in advance of the effective date of such revised Budget (a "Committee/IFC Budget Objection"). If no Committee/IFC Budget Objection is timely made, the Creditors Committee and IFC shall be deemed to have consented to such revised Budget and waived any objections thereto.    If a Committee/IFC Budget Objection is timely made, the parties shall make good-faith efforts to resolve such objection prior to the effective date of such revised Budget.  If the Committee/IFC Budget Objection cannot be resolved by the parties, to preserve the Committee/IFC Budget Objection, the Creditors' Committee or IFC, as the case may be, must file and serve an objection with the Court (the "Formal Objection") no less than two (2) business days prior to the effective date of such revised Budget.  Pending the Court's resolution of the Committee/IFC Budget Objection, the Debtor shall not be permitted to pay any expenses set forth in the Formal Objection.

31.    The Creditors' Committee and IFC shall receive all reports and notice that the Debtor is required to give to the Lender hereunder, simultaneously with the Debtor's transmission of such reports to the Lender.

- 33 -

32.    Nothing contained in this Order shall constitute a finding, determination or admission that IFC has or does not have any interests and/or rights in the Pre-Petition Collateral and/or Collateral or to the proceeds of any of the Pre-Petition Collateral and/or Collateral superior to the rights of any other creditor. The Debtor, the Lender and the Committee expressly reserve all of their rights to object to the enforcement of any provision of the Intercreditor Agreement, including, but not limited to,  any provision which IFC may allege grants IFC interests and/or rights in the Pre-Petition Collateral and/or Collateral or proceeds thereof, and IFC expressly reserves its rights, except to the extent set forth in this Order, to seek to enforce the terms of the Intercreditor Agreement.  Notwithstanding any obligations of the Lender set forth under this Order, including, without limitation, with respect to the Budgeted/Incurred Claims, the Carve-Out, or any other budgeted compensation or reimbursement of expenses of the Creditors' Committee or the professionals for the Debtor or the Creditors' Committee, the Lender shall not be liable to any party for payment or reimbursement of any amounts that are paid, returned, subordinated or disgorged in connection with or in any way relating to the IFC 507(b) Claims, whether or not any such amounts were previously paid by the Lender.

Dated: September 2<u>9</u>, 2004

_Bruce W. Black_
UNITED STATES BANKRUPTCY JUDGE

- 34 -

**Chapco Carton Company**
**Cash Flow Forecast ($000)**
**For the Weeks Ending**
**October 9, 2004 - October 30, 2004**

| Description | Post-Petition Week Ending 10/9/04 | Post-Petition Week Ending 10/16/04 | Post-Petition Week Ending 10/23/04 | Post-Petition Week Ending 10/30/04 | Four Week Post-Petition Total |
|---|---|---|---|---|---|
| **BOOK BALANCE RECONCILIATION** | | | | | |
| **Plus: Cash Collections** | | | | | |
| Pre-petition A/R | - | - | - | - | - |
| Post-petition A/R (Loading) | 112.8 | - | - | - | 112.8 |
| Plus: Expected Bottle payments (existing a/r) | 575.0 | 575.0 | 575.0 | 525.0 | 2,250.0 |
| New Sales - base | 220.0 | 220.0 | 220.0 | 220.0 | 880.0 |
| Plus: Expected Bottle payments (new sales) | | | | | |
| Less: Reductions in base forecast by expedited Bottle payments (i.e. new sales freight) A/R | (220.0) | (220.0) | (220.0) | (220.0) | (880.0) |
| **Total Cash Collections** | $ 687.8 | $ 575.0 | $ 575.0 | $ 525.0 | $ 2,362.8 |
| **Operating Disbursements** | | | | | |
| Purchasing Disbursements | $ (277.0) | $ (267.4) | $ (267.4) | $ (267.4) | $ (1,079.6) |
| Manufacturing Overhead | (207.7) | (248.2) | (182.1) | (243.2) | (880.8) |
| Total Cost of Sales (Cash) | $ (484.6) | $ (515.6) | $ (449.5) | $ (510.6) | $ (1,960.5) |
| Selling & Admin. Expenses (Cash) | (34.7) | (81.8) | (34.7) | (81.8) | (233.0) |
| Total Operating Disbursements | $ (519.3) | $ (597.4) | $ (484.2) | $ (592.4) | $ (2,193.4) |
| Net Sales | 576.4 | 576.4 | 576.4 | 576.4 | 2,305.6 |
| **Non-Operating Disbursements** | | | | | |
| Bank DIP Finance Agreement Fees/Interest | - | - | - | - | - |
| Bank legal counsel professional fees | (2.5) | (2.5) | (2.5) | (2.5) | (10.0) |
| Unsecured Creditor Committee fees/retainers | (7.5) | (7.5) | (7.5) | (7.5) | (30.0) |
| Miller, Cooper | - | (7.0) | - | - | (7.0) |
| Kagman Associates | (25.0) | (25.0) | (25.0) | (25.0) | (100.0) |
| Adelman & Gettleman | (15.0) | (15.0) | (15.0) | (15.0) | (60.0) |
| Total Non-Operating Disbursements | (50.0) | (57.0) | (50.0) | (50.0) | (207.0) |
| Total Disbursements | (569.3) | (654.4) | (534.2) | (642.4) | (2,400.4) |

Chapco DIP Operating Budget v5.2.xls
9/29/2004, 8:37 AM